[No. S052808. Mar. 18, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD CAMERON GAMACHE, Defendant and Appellant.

[black redaction bars]

## COUNSEL

Richard Jay Moller, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Holly D. Wilkens and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—A jury convicted defendant Richard Cameron Gamache of first degree murder with robbery, burglary, and kidnapping special circumstances, as well as various lesser crimes, for the 1992 abduction and killing of Lee Williams. (Pen. Code, §§ 187, 189, 190.2, former subd. (a)(i), (ii) & (vii), now subd. (a)(17)(A), (B) & (G).)[1] It thereafter returned a death verdict. On automatic appeal, we affirm the judgment as to Gamache's death sentence, but reverse in part to allow the trial court to correct error in Gamache's determinate sentences for his noncapital crimes.

### FACTUAL AND PROCEDURAL BACKGROUND

In November 1992, Richard Gamache, then 18 years old, was discharged from the Army. He returned to San Bernardino County, where his estranged wife, Tammy, lived. After he reconciled with his wife, they moved in with a minor friend, Thomas P., in Yermo while planning what to do next. Tammy Gamache had studied animal husbandry and loved horses, so the Gamaches decided to acquire horses and go to Washington to camp in the wilderness. Tammy Gamache had once lived next door to a Yermo couple, Lee and Peggy Williams, who owned horses; she told Richard Gamache about them.

---

[1] All further unlabeled statutory references are to the Penal Code.

*Guilt Phase Trial*

*Prosecution Evidence*

Around December 1, 1992, Tammy Gamache talked with a friend, Melanie Foote, and Foote's grandparents about the Gamaches' plans to move to Washington with some horses. She indicated they were planning to buy horses soon and asked whether they could keep them temporarily at Foote's grandparents' ranch. Foote's grandmother agreed.

On the afternoon of December 3, Richard Gamache, Andre Ramnanan, and an acquaintance, Donald Gray, went target shooting in the desert outside Yermo. Gray testified he overheard Gamache and Ramnanan discussing plans to steal horses, a horse trailer, and a mobilehome and take them to Washington or Oregon to live off the land. Gamache and Ramnanan would tie the victims up and shoot them if they gave them any trouble.

Around 7:30 p.m. on December 3, the Gamaches borrowed the car of Randy Vojkufka, who was also staying at Thomas P.'s residence. They drove to the Foote ranch and confirmed arrangements to drop off horses and a horse trailer there later that evening, and to pick them up again in two days. They left the Foote ranch around 10:30 p.m.

After 11:00 p.m., Peggy Williams testified, she was awoken by a knock at the door of her home. She woke her husband, Lee Williams, and he answered the door. She got up a few minutes later and went to the kitchen. Tammy Gamache was using the phone; Thomas P. and Andre Ramnanan were standing with Lee. Richard Gamache came up behind Peggy, put his arm around her neck, and held a gun to her head. Ramnanan held a gun to Lee's head. Lee and Peggy Williams were made to lie facedown; Richard Gamache ordered Lee to cooperate or he would kill Peggy. Someone tied Peggy's hands behind her back with a shoelace.

Tammy Gamache asked where the horse halters and truck keys were and left. She later returned, reported she had hooked up the horse trailer, and asked Lee Williams about the horses' care and the location of their blankets and saddles.

Meanwhile, Richard Gamache and Ramnanan plundered the house, taking a television, videocassette recorder, camcorder, food dehydrator and vacuum sealer, jewelry, approximately $4,500 in cash, numerous guns, Lee's wallet,

Peggy's watch, and the couple's wedding rings.[2] Throughout this process, they were laughing and having a good time. Richard Gamache asked for the pink slips (titles) to the Williamses' vehicles; Peggy Williams replied they did not yet have them because they were still making payments.

Richard Gamache and Ramnanan announced it was time to go. Gamache asked Lee Williams if anyone would miss them and how often people came to the house. Lee and Peggy Williams were taken barefoot, in their bathrobes, out to their motor home. Peggy asked if she could get shoes; Richard Gamache told her she would not need them. Gamache and the others turned out the lights and locked the doors.

In the motor home, Richard Gamache and Ramnanan bound and gagged the Williamses. Gamache drove; Ramnanan guarded them with a gun. Tammy Gamache drove the Williamses' truck and horse trailer. When they arrived at Thomas P.'s house, where Thomas P. was dropped off, they ungagged and untied Peggy Williams. The Gamaches dictated bills of sale for the Williamses' motor home, truck, trailer, and car; Peggy wrote them out and signed them. Lee Williams was also forced to sign them.

Richard Gamache resumed driving the motor home. After some time he stopped, and he and Ramnanan walked the Williamses from the roadside a short distance into the desert. Gamache made them lie facedown on the ground. He said, "Thank you and have a nice day" and shot Lee Williams in the head. He then shot Peggy Williams in the head. Gamache and Ramnanan questioned whether she was dead, shined a light in her eyes, and checked her pulse; Gamache then shot her again. Gamache and Ramnanan walked off and drove away. Peggy waited to confirm they were gone, unsuccessfully tried to get a response from Lee, and then walked toward the lights of a truckstop in the distance and called 911 when she got there.

When the police arrived, Peggy Williams described her attackers and provided license plate numbers for the stolen vehicles. Within an hour, the police located the motor home in a café parking lot nearby. They broke in and found it filled with stolen property from the Williamses' home. They then waited to see if anyone would return.

Shortly after 5:00 a.m., now on the morning of December 4, Richard and Tammy Gamache returned to the motor home in the Williamses' truck, having dropped off the horses and horse gear at the Foote ranch. They were arrested. In the truck, police found the murder weapon (a .32-caliber handgun), other

---

[2] Richard Gamache removed Peggy's wedding ring and told Tammy Gamache it was a late wedding present; Tammy laughed.

weapons, a bag of cash, and the dictated bills of sale for the Williamses' vehicles. A search of Thomas P.'s residence the same morning turned up more weapons and jewelry, as well as bloody clothing. Tammy Gamache agreed to help the police find Lee Williams and took them to his body. She then took the police to the Foote ranch where they recovered the horses, horse trailer, horse equipment, and more guns.

Ramnanan was arrested late on the evening of December 4. Peggy Williams's car was found nearby.

### Defense Evidence

Richard Gamache presented no witnesses, relying instead on cross-examination. In closing argument, he conceded he was guilty of murder, attempted murder, robbery, and burglary. He argued, however, that the jury should not convict him of kidnapping for robbery, as the robberies were already completed before the kidnappings, and that the jury should not find any special circumstances true, because the kidnappings, robberies, and burglary were all completed before he decided to shoot the Williamses.

### Penalty Phase Trial

### Prosecution Evidence

The prosecution elaborated on the circumstances of the crime with further testimony from Peggy Williams, a 40-minute tape of Richard and Tammy Gamache and Andre Ramnanan jointly confessing on December 7 to the details of the crimes, and two police officers testifying to statements Richard Gamache had made about the crimes while in police custody.

The prosecution presented victim impact evidence from Peggy Williams. She described Lee Williams and their happy marriage, and how when he was shot and died in her arms she lost her "world." She described the flashbacks, anxiety, panic, and depression she had experienced since the shootings, and how she eventually left her job and her home. Peggy Williams's psychotherapist, Dr. Jennifer Reese, testified Williams had made little improvement in the years since the shootings and likely would never recover completely.

The prosecution introduced evidence of two other uncharged crimes by Richard Gamache in the month before the murder: an incident in which he had tied up a roommate, accused him of saying Gamache had not paid his rent, and then waterboarded him; and an incident in which he and Ramnanan had taken over a pizzeria at closing, robbed the employees, and emptied the cash register. During the robbery, Gamache held a knife to the throat of one

employee and, after taking the wallet of another employee and noting his name and address, threatened to hunt him down and kill him if he went to the police.

The prosecution also presented evidence that Gamache had plotted an escape from prison while awaiting trial.

### Defense Evidence

Richard Gamache called his mother, a psychiatrist who had examined his mother, and several psychiatrists who had examined him. Testimony about his childhood showed his mother had left his father when Gamache was in utero because the father's beatings had threatened a miscarriage. His mother had had Gamache when she was 17 years old. She had been abused by a series of other boyfriends and husbands in addition to Gamache's father, had been raped, had used drugs and become a prostitute, and had repeatedly tried to kill herself. Gamache and his mother moved frequently. He missed a year of school (fourth grade) to stay home and take care of his mother, who had had ovarian cancer and a hysterectomy. By age 10 or 11, Gamache was left alone at home to fend for himself several days a week. He eventually dropped out of high school, got his GED (general equivalency diploma), and joined the Army, but was discharged in November 1992 for psychological reasons. He experienced feelings of anger and hopelessness as a result.

Gamache had a long history of dreams, fantasies, and delusions about engaging in violent behavior. Dr. Michael Kania testified Gamache had a borderline personality disorder, also known as a cycloid personality disorder or unstable personality disorder. He was highly impulsive and subject to rapid mood swings, with a great deal of underlying anger. Dr. Kania likened Gamache to a stick of dynamite and concluded he had a very serious mental disorder.

Dr. Lorna Forbes testified Gamache was legally insane at the time he shot the Williamses. She also concluded he was schizophrenic. Though he admitted planning to kill the Williamses from the beginning, this was the product of a delusional mind. Gamache was probably untreatable.

### Procedural History

Richard Gamache, Tammy Gamache, and Andre Ramnanan were each charged with first degree murder with three special circumstances, murder during the commission of a robbery, murder during the commission of a burglary, and murder during the commission of a kidnapping. (§§ 187, 189, 190.2, former subd. (a)(i), (ii) & (vii), now subd. (a)(17)(A), (B) & (G).)

They were also charged with attempted murder (§§ 187, 664), two counts of residential robbery (§ 211), residential burglary (§ 459), two counts of kidnapping for robbery (§ 209, subd. (b)), and firearm use enhancements (§ 12022.5, subd. (a)). They were tried jointly. A jury convicted each defendant of first degree murder and found all the special circumstances true. It also convicted each defendant of all the lesser offenses, found the firearm use enhancements true for Richard Gamache and Andre Ramnanan, and found them not true for Tammy Gamache.

At the penalty phase, the jury returned a verdict of death for Richard Gamache, a verdict of life for Andre Ramnanan, and could not reach a verdict for Tammy Gamache. The prosecution abandoned further attempts to seek the death penalty against Tammy Gamache, who was sentenced to life in prison without the possibility of parole.

## DISCUSSION

### I. *Guilt Phase Claims*

#### A. *Denial of Prosecutorial Recusal Motion (§ 1424)*

Before trial, Richard Gamache moved to recuse the entire San Bernardino County District Attorney's Office. (§ 1424.) He argued the district attorney's office had a conflict because the surviving victim of the crimes, Peggy Williams, had been employed in the district attorney's office as a typist for 10 years. The trial court held a series of evidentiary hearings and concluded Gamache had failed to establish a conflict warranting recusal. We conclude the trial court did not abuse its discretion.

We recently reiterated the principles governing this claim. "Section 1424 sets out the standard governing motions to recuse a prosecutor: such a motion 'may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.' (*Id.*, subd. (a)(1).) The statute 'articulates a two-part test: "(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?" ' " (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 [76 Cal.Rptr.3d 250, 182 P.3d 579].) Where, as here, a defendant seeks to recuse not just an individual prosecutor but also an entire prosecuting office, he must make an "especially persuasive" showing. (*People v. Hamilton* (1988) 46 Cal.3d 123, 139 [249 Cal.Rptr. 320, 756 P.2d 1348].) We review the trial court's decision to deny a recusal motion, even in a capital case such as this one, only for an abuse of discretion. (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 728–729 [76 Cal.Rptr.3d 264, 182 P.3d 590].) Accordingly, we must determine whether the trial court's findings were

supported by substantial evidence and whether, in turn, those findings support the decision to deny recusal. (*People v. Vasquez* (2006) 39 Cal.4th 47, 56 [45 Cal.Rptr.3d 372, 137 P.3d 199].)

As to the first prong of section 1424, we agree with Gamache that the prosecution had a conflict; that is, there was "a reasonable *possibility* that [the prosecution's] impartial exercise of discretion might be affected . . . ." (*Haraguchi v. Superior Court, supra,* 43 Cal.4th at pp. 717–718, fn. 13; see also *People v. Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5] [A conflict exists "whenever the circumstances of a case evidence a reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner."].) Peggy Williams was employed by the San Bernardino County District Attorney's Office as a transcriber/typist. She had worked for the district attorney's office for 10 years at the time of the crimes. She was a victim in the case and its most important witness, and remained deeply emotionally affected by these crimes. Moreover, the murder victim, Lee Williams, was her husband and thus related to a district attorney's office employee.

We have recognized this situation as a paradigmatic conflict. In *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164], we considered a special circumstance murder case in which the victim's mother was a discovery clerk for the district attorney's office charged with prosecuting the case. The victim's mother's grief was evident to her coworkers; as well, she stood to be a material witness for the prosecution. (*Id.* at p. 259.) We concluded that where "[t]he victim of the homicide was the son of a member of the district attorney's staff who worked in the very office in which the prosecution was being prepared" (*id.* at p. 270), it was not an abuse of discretion to find a conflict (*id.* at p. 269). Similarly, in *People v. Conner, supra,* 34 Cal.3d at page 148, we recognized that where a deputy district attorney was a material witness to a shooting and himself potentially a victim, having possibly been shot at, these circumstances could pose a conflict for the district attorney's office. As well, in *People v. Vasquez, supra,* 39 Cal.4th at pages 57–58, we recognized that the fact a district attorney's office employed both the defendant's mother and his stepfather could give rise to a conflict. (See also *Lewis v. Superior Court* (1997) 53 Cal.App.4th 1277, 1283–1284 [62 Cal.Rptr.2d 331] [conflict arising from the fact that every district attorney's office employee was necessarily a victim of the charged crimes].) Peggy Williams's roles as employee, victim, relative of a second victim, and witness created at least the possibility the San Bernardino County District Attorney's Office might be influenced in its discretionary decisionmaking.

However, the possibility that a prosecutor might be influenced does not alone establish the requisite likelihood or probability that a defendant will be treated unfairly. The trial court here conducted a two-day hearing. Based on all the evidence adduced, it concluded Gamache and his codefendants had not shown a conflict rising to a level that would require recusal. Having reviewed that evidence, we conclude the trial court did not abuse its discretion because substantial evidence fully supports that conclusion.

The San Bernardino County District Attorney's Office is large, with 500 employees and 122 deputy district attorneys. Because of San Bernardino County's huge geographic spread,[3] the district attorney's office is divided into three administratively and operationally separate divisions. The murder occurred in the area covered by the Desert Division, where Peggy Williams worked, and was initially handled by prosecutors from that office. On December 7, 1992, Gamache was charged with first degree murder. On December 8, an amended complaint was filed adding special circumstance allegations. After the holidays, by January 7, 1993, the case was reassigned from the Desert Division in Barstow to the Central Division in San Bernardino, 75 miles away, and all further proceedings were handled by the Central Division.

We consider first whether the decision to charge Gamache with special circumstances and to seek the death penalty was likely to have been infected by the conflict. The record supports the trial court's conclusion that it was not, as the decision maker had no personal relationship with Peggy Williams and based his decision on input from others with no connection to Peggy Williams.

According to witnesses, District Attorney Dennis Kottmeier made the decision to retain the case as a special circumstances case and to seek the death penalty following a February 23, 1993, meeting with his chief deputies and the assigned prosecutor. Every witness testified that the decision to file special circumstances and seek death was Kottmeier's, and Kottmeier's alone. Kottmeier barely knew Peggy Williams. He had not hired her, had never had social contact with her, did not know her by name, and would have recognized her face only in context if he had seen her while visiting the Barstow office where she worked; he would not have recognized her if he had run into her on the street. He did not know Lee Williams at all. Kottmeier testified repeatedly that Peggy Williams's status as an employee of the district attorney's office played no role in his decision to seek death for Gamache.

---

[3] We may judicially notice, as did the trial court, that San Bernardino County is the largest county in the continental United States. (Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

The assigned prosecutor, Raymond Haight, prepared the initial recommendation to Kottmeier that the prosecution should seek the death penalty. He did not know Peggy Williams, and her employment status played no role in his recommendation.

The other attorneys who played advisory roles and consulted with Kottmeier on the decision to seek the death penalty testified similarly. Chief deputy district attorneys Richard Maxwell, James Hackleman, and Michael Kewin did not know Peggy or Lee Williams at all. Peggy Williams's status as an employee played no role in their discussions with Kottmeier about the case and in the decision to seek death. Notably, the one chief deputy who did know Peggy Williams, Dennis Christy,[4] immediately recognized his participation in the case could create a recusal problem, concluded he should have no role in any discretionary decisions, and took no part in the discussion during the February 1993 staff meeting at which Kottmeier decided to seek death. The record here thus stands in sharp contrast to *People v. Vasquez, supra,* 39 Cal.4th at pages 56–58, where uncontradicted evidence established that the defendant's relationship to employees of the district attorney's office played a role in the handling of the case and where, accordingly, we found recusal mandated.

Gamache argues it was error not to disregard this testimony because Kottmeier visited Peggy Williams in the hospital once, on the day she was shot, and later attended Lee Williams's funeral and offered Peggy Williams a word or two of condolence. Gamache also points out that Kewin, the chief deputy in charge of administrative services, spoke to the office's victim witness personnel about providing services to Peggy Williams. These actions demonstrate Kottmeier and Kewin were human and humane; they are not of the sort that would demonstrate Kottmeier inevitably must have been subconsciously influenced by Peggy Williams's employment status in deciding whether to seek the death penalty for Gamache. The trial court heard Kottmeier's testimony, and that of each of his deputies, and found the disavowals of any influence credible. It was entitled to do so.

Further, Gamache argues that Christy, the chief deputy who knew Peggy Williams well, critically affected the decision to seek the death penalty. The record does not support his argument. Gamache and his codefendants were arrested on Friday, December 4, 1992, and Eric Nakata, the deputy district attorney initially responsible for the case, filed a felony complaint on Monday, December 7. Sometime in these first few days, Christy mentioned to Kottmeier a previous possible death case in which S. Donald Ames, Gamache's counsel, had created procedural difficulties by having his client

---

[4] Christy was the chief deputy supervising the Desert Division, where Peggy Williams worked.

plead guilty at arraignment, before any special circumstances had been added. Kottmeier directed Christy to avoid this possibility by having special circumstances filed immediately, and an amended complaint charging special circumstances was filed on December 8.

Notably, however, Kottmeier and Christy both testified that this early addition of special circumstances was purely procedural, to preserve the status quo and the option of seeking death. Kottmeier reserved judgment until more facts were known and did not decide to pursue the case as a special circumstance murder and to seek the death penalty until February 1993, after the preliminary hearing. Christy and Kottmeier testified, without contradiction, that Christy had played no role in any of the subsequent substantive discussions that led to Kottmeier's ultimate decision.

There is likewise evidence to support the trial court's conclusion that Peggy Williams's employment by the district attorney's office would not affect the subsequent conduct of the trial. As noted, the San Bernardino County District Attorney's Office is unusually large and consequently is divided into administratively and operationally separate divisions. There is little to no employee mixing between these divisions. Within approximately one month, the case had been reassigned from the Desert Division in Barstow, where Peggy Williams worked, to the Central Division in San Bernardino, an office 75 miles away. Prosecutor Raymond Haight had never worked in Barstow and had never met Peggy Williams. Indeed, he was part of a career criminal prosecution group that was segregated on its own floor and had its own staff, even apart from the rest of the San Bernardino office. District Attorney Kottmeier established an ethical screen so no Desert Division employees would have any role in the case, and no evidence was advanced that would suggest such screens had not been or could not be effective. The record thus supports the trial court's conclusion that, because of the prompt steps taken to screen off prosecution of this case from those employees who might have any connection to Peggy Williams, there was no likelihood the conflict would lead to unfair treatment of Gamache at trial.

The size of the office and the ability of the San Bernardino County District Attorney's Office to set up effective ethical screens distinguish this case from those on which Gamache relies. (See *People v. Vasquez, supra,* 39 Cal.4th at p. 57 [emphasizing the significance of the size of a prosecutor's office in deciding whether recusal of the entire office is necessary]; *In re Charlisse C.* (2008) 45 Cal.4th 145, 163 [84 Cal.Rptr.3d 597, 194 P.3d 330] [noting ethical screens may obviate the need to recuse an entire government law office]; *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839,

853 [43 Cal.Rptr.3d 771, 135 P.3d 20] [same].) In *People v. Superior Court (Greer)*, *supra*, 19 Cal.3d at page 270, we emphasized that the victim's mother "worked in the very office in which the prosecution was being prepared." In *People v. Conner*, *supra*, 34 Cal.3d at pages 148–149, we found it critical that the felony division of the district attorney's office consisted of only 25 attorneys; one of the 25 was a victim and a witness, and his experiences had been discussed pervasively throughout the office. And in *People v. Choi* (2000) 80 Cal.App.4th 476, 483 [94 Cal.Rptr.2d 922], recusal was appropriate because no effective ethical wall was in place; though the district attorney's office had in theory set up such a wall, in practice the conflicted district attorney continued to communicate with others in the office about the case.[5] In light of the contrasting facts here, the trial court did not abuse its discretion when it declined to order recusal.

 Gamache also argues that the trial court deprived him of his federal due process rights by denying recusal. (U.S. Const., 14th Amend.)[6] However, we have explained that section 1424's recusal standards are prophylactic in nature and "serve[] to prevent potential constitutional [due process] violations from occurring." (*People v. Vasquez*, *supra*, 39 Cal.4th at p. 59.) If recusal was properly denied under section 1424, ipso facto no due process violation occurred.

### B. *Imposition of Security Belt and Shackles*

Gamache contends the trial court erred by requiring him to wear leg shackles and an electronic security belt during trial, in violation of his rights to a fair and reliable capital trial. (U.S. Const., 5th, 6th, 8th & 14th Amends.) We find no abuse of discretion.

 " '[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a

---

[5] Significantly as well, in each of these cases the trial court ordered recusal, while here it did not. (See *People v. Conner*, *supra*, 34 Cal.3d at p. 149; *People v. Superior Court (Greer)*, *supra*, 19 Cal.3d at p. 269; *People v. Choi*, *supra*, 80 Cal.App.4th at p. 483.) Given the deferential standard of review applicable to rulings on recusal motions, in many cases the record may contain sufficient evidence to support either a grant or a denial, and an appellate court may be precluded from disturbing either ruling.

[6] With this and virtually every one of his appellate claims, Gamache has added a constitutional gloss, asserting that state law error also amounted to a violation of federal, or state and federal, constitutional rights. In many instances these constitutional grounds were not identified in the trial court. Except as noted, however, we will address them on the merits because these claims involved legal standards no different from the ones the trial court was already called upon to apply. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1050, fn. 4 [81 Cal.Rptr.3d 651, 189 P.3d 911]; *People v. Partida* (2005) 37 Cal.4th 428, 435–437 [35 Cal.Rptr.3d 644, 122 P.3d 765].) To the extent the constitutional gloss involves no different standards, no separate discussion is required, and we will provide none. (*Wallace*, at p. 1050, fn. 4; *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

manifest need for such restraints.' " (*People v. Wallace, supra,* 44 Cal.4th at p. 1050.) The Fifth and Fourteenth Amendments to the federal Constitution bar the use of visible restraints "unless the trial court has found that the restraints are justified by a state interest specific to the particular trial." (*People v. Stevens* (2009) 47 Cal.4th 625, 633 [101 Cal.Rptr.3d 14, 218 P.3d 272]; see also *Deck v. Missouri* (2005) 544 U.S. 622, 629 [161 L.Ed.2d 953, 125 S.Ct. 2007].)

In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." (*Deck v. Missouri, supra,* 544 U.S. at p. 629.) These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior. (*Id.* at pp. 628–629, 633; *People v. Stevens, supra,* 47 Cal.4th at p. 633; *People v. Seaton* (2001) 26 Cal.4th 598, 651 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Duran* (1976) 16 Cal.3d 282, 291 [127 Cal.Rptr. 618, 545 P.2d 1322].) If the record establishes restraints are necessary, a trial court should select the least obtrusive method that will be effective under the circumstances. (*Duran,* at p. 291.) These principles apply fully to the decision whether to require a defendant to wear an electronic security belt, also known as a stun belt, notwithstanding that such a belt may not be visible to the jury. (*People v. Mar* (2002) 28 Cal.4th 1201, 1219 [124 Cal.Rptr.2d 161, 52 P.3d 95].)[7]

Because a "trial court has broad power to maintain courtroom security and orderly proceedings" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645]), we review decisions regarding the physical restraint of a defendant for abuse of discretion. (*Ibid.*; *People v. Wallace, supra,* 44 Cal.4th at p. 1050; *People v. Ayala* (2000) 23 Cal.4th 225, 253 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Duran, supra,* 16 Cal.3d at p. 293, fn. 12.) "No formal hearing is necessary to fulfill the mandate of *Duran*; however, the record must show the court based its determination on facts, not rumor and innuendo." (*People v. Stevens, supra,* 47 Cal.4th at p. 633.) The

---

[7] The security belt at issue here is the same one we described in *People v. Mar, supra,* 28 Cal.4th at pages 1214–1215, a remote electronically activated control technology (REACT) belt. The belt is controlled remotely; a security deputy assigned to monitor a defendant can send an audible warning beep to alert the defendant to stop any offending conduct. If the defendant fails to do so, the assigned deputy can deliver a 50,000-volt shock. During ordinary use, the belts should not be visible to the jury once covered with loose clothing.

In *People v. Mar, supra,* 28 Cal.4th at pages 1225–1230, we also laid out a series of additional considerations for trial courts to take into account in deciding whether to order use of a stun belt. We expressly counseled that those considerations were being offered only for guidance in future trials. (*Id.* at pp. 1225, 1230.) As the trial here occurred before *Mar* was decided, we need not address those additional considerations further.

imposition of restraints without evidence in the record establishing a threat of violence, escape, or nonconforming conduct is an abuse of discretion. (*Duran*, at p. 291.) Thus, we consider whether the trial court made the findings necessary to impose a particular security measure—that there was a manifest need, and that the measure chosen was the least obtrusive that would still be effective—and further whether those findings were supported by substantial evidence.

On June 22, 1995, the trial court held a pretrial hearing to address security measures. The People introduced evidence that in July 1994 Gamache's cell had been searched and he had been found with a hacksaw, 42 ounces of toothpaste,[8] plans for a homemade silencer, and a written escape plan. The five-step escape plan, which Gamache admitted writing, involved his (1) getting a saw blade, a lighter, and street clothes; (2) cutting his cell bars and making "didimow";[9] (3) committing a carjacking to get money and a car, and then either (a) going to "Spink's house," then Ord Mountain (the area where he and Ramnanan had taken target practice on Dec. 3, 1992) to get a gun, or (b) if there happened to be a gun in the car already, going directly to Laughlin or Las Vegas, Nevada; (4) robbing a casino and changing his identity; and (5) buying equipment to "big hit" Bullhead (an airport outside Laughlin) or "St. Mary's" (unknown).

On May 13, 1995, just a month before the hearing, deputies at the jail where Gamache was being held searched an inmate who was about to be released and found a sealed letter he was attempting to smuggle out and mail on Gamache's behalf. The letter, to Gamache's mother, asked her to get a device to trigger the stun belt Gamache expected to wear at trial. Gamache believed this would result in a mistrial. Then Gamache could either escape from the hospital, with the help of outsiders "eddy and gene," or escape from court using equipment he would buy with money he would receive after successfully suing over being inadvertently shocked.

On May 17, just days later, deputies intercepted a second letter from Gamache to his mother, again asking her to get a device to trigger his stun belt, whereby he could obtain a mistrial and sue for "150 thou or so." Deputies interpreted both letters as asking Gamache's mother to get a device that might override the stun belt and allow Gamache to escape directly from the courtroom.

The People also presented testimony from the marshal in charge of security for the courthouse. He testified that security was hampered by the fact the

---

[8] A detective for the sheriff's office testified that toothpaste could be used to saw through bars, presumably after drying and hardening it.

[9] When questioned, Gamache explained "didimow" meant "escape."

courthouse had numerous public entrances, but no metal detecting equipment. He further testified that Gamache, alone among the three defendants, had been designated a high-security escape risk.

The trial court made an express finding that the evidence established a "manifest need to restrain [Gamache] in some fashion during trial in the presence of the jury." (See *People v. Duran, supra,* 16 Cal.3d at pp. 290–291.) It cited the escape plan and hacksaw found in Gamache's cell the previous year, as well as the two letters sent a month before the hearing, again plotting an escape. In part because of concerns that Gamache might use the stun belt itself as part of an escape plan, the court concluded ankle shackles, arranged so the jury would not see them, were the preferred means of restraint.

On August 7, 1995, at the People's request, the trial court held a second pretrial hearing to address Gamache's restraints. The People provided a marshal's report indicating that Gamache had been found with a homemade handcuff key a few days earlier. The People further indicated Gamache had been found with an elastic file fastener that he allegedly was seeking to shape into a weapon. Gamache admitted possession of the fastener, but argued the handcuff key had been planted in his shoe and, in any event, might not have worked to open his shackles. As a final point, the People represented that Gamache's mother, to whom his earlier escape letters had been directed, had gone to the Barstow marshal's office and said that if the trial had been in Barstow, she " 'would have blown up the courthouse and everybody else.' "[10] Gamache conceded his mother had threatened to blow up a courthouse. Based on this, the People feared Gamache might still have outside help to assist in a potential escape.

In light of this additional record, the trial court made an express finding that use of a stun belt in addition to shackles was now appropriate, provided the stun belt was "properly concealed from the jury's view as much as possible." Defense counsel assured the court that they would make arrangements to ensure Gamache would be dressed in such a fashion as to conceal the belt.

The trial court did not abuse its discretion. It made express findings at both the June 22 and August 7 hearings that restraints were called for. Those findings were fully supported by evidence in the record establishing that Gamache was a genuine escape risk. The court considered in each instance the least obtrusive means that would suffice to address the perceived security problem Gamache posed, initially ordering just shackles that could be

---

[10] Pretrial proceedings had been conducted in Barstow, a few miles west of Yermo, but the trial was held in San Bernardino, 75 miles to the southwest.

concealed from the jury. Only after Gamache and his mother had provided additional evidence that he remained an escape risk and that restraints impervious to picking with a homemade key were necessary, did the trial court order the stun belt. Even then, the court remained cognizant of the possibility for prejudice and took steps to ensure that the stun belt, like the shackles, would not be visible to the jury.

Before us, Gamache argues that the trial court should have discounted any possibility of escape as the product of a delusional mind. He further argues that he was never disruptive or violent in court. As to the first point, the record establishes his escape plans were not only in his head. The homemade handcuff key was real, and the trial court was permitted to disbelieve his protestations that the key was not his. So were the letters he wrote to his mother, asking for help in escaping. The trial court could credit testimony that indicated the threat of an escape attempt was genuine and could take into account that Gamache was devising ever-changing methods: a hacksaw, an electronic device to control his stun belt, a homemade handcuff key. His letters suggested he had become desperate in the face of the potential punishment he faced. Given time, Gamache might attempt anything. The trial court was entitled to prepare for that risk.

█ As to the second point, that he was never disruptive or violent in the courtroom, the *People v. Duran, supra,* 16 Cal.3d 282, requirement that the record establish a threat of violence, escape, or disruption is framed in the disjunctive. Where the record establishes a threat of escape, a defendant cannot plead no threat of violence or disruption, and vice versa; the banks he has not robbed do not excuse the banks he has. If any threat in one of these categories is established, a trial court is entitled to take appropriate measures, consistent with the requirement that it choose the least obtrusive restraints necessary. It did so here.

### C. *Prosecutorial Misconduct: Guilt Phase Closing Argument*

Gamache contends various prosecutorial remarks during the guilt phase closing argument constituted misconduct, thereby violating his rights to due process and a fair trial. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) We disagree.

█ Under the federal Constitution, a prosecutor's behavior deprives a defendant of his rights "when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *People v. Wallace, supra,* 44

Cal.4th at p. 1070.) Conduct that falls short of that standard "may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah* (2005) 35 Cal.4th 395, 462 [25 Cal.Rptr.3d 672, 107 P.3d 790]; accord, *Wallace*, at p. 1070.)

■ " ' " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations] . . .' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " [Citation.]' " (*People v. Stanley* (2006) 39 Cal.4th 913, 951–952 [47 Cal.Rptr.3d 420, 140 P.3d 736]; see also *People v. Jablonski* (2006) 37 Cal.4th 774, 835 [38 Cal.Rptr.3d 98, 126 P.3d 938].) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

■ To preserve a claim for appeal under either state or federal law, a defendant must raise a contemporaneous objection at trial and seek a jury admonition. (*People v. Bonilla* (2007) 41 Cal.4th 313, 336 [60 Cal.Rptr.3d 209, 160 P.3d 84].) In the absence of an objection, any claim is forfeited unless an exception applies. (*People v. Avila* (2009) 46 Cal.4th 680, 710–711 [94 Cal.Rptr.3d 699, 208 P.3d 634].) In those instances where Gamache concedes he failed to object, he argues his failure is excused because an objection would have been futile and an admonition would have failed to cure any harm. However, "[a] defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah*, *supra*, 35 Cal.4th at p. 462.) Considering each instance of alleged prosecutorial misconduct, we find several of the claims forfeited and all of the claims unfounded.

(1) At the beginning of his closing argument, the prosecutor explained he would be spending most of his time on the case against Tammy Gamache and Andre Ramnanan because the evidence against Richard Gamache was largely uncontested, and the jury should not read into this any concession that Richard Gamache was not central to the crimes. He explained: "As you heard from the law, he's, as the actual shooter—and I think everybody agrees he's the actual shooter—he's in a slightly different legal position than Andre and Tammy . . . . So, as I look at it, looking at the facts, he doesn't have

anywhere to go. So I'm not going to talk too much about him, [be]cause *I think everybody here expects you to find him guilty and find the charges true.*" (Italics added.)

Gamache argues this last remark would have caused the jury to abdicate its responsibilities and substitute the expectations of others for its own judgments. As no objection was made, this argument is forfeited. It is also meritless. The prosecutor's remark was a fair comment on the state of the evidence, which showed without dispute that Gamache had intentionally robbed, kidnapped, and then shot the Williamses. There is no reasonable likelihood a jury would have understood these remarks as expressing anything other than the prosecutor's expectation that the jury would find Richard Gamache an easier case than his codefendants.

(2) As promised, the prosecutor spent the bulk of his argument highlighting evidence that showed Andre Ramnanan and Tammy Gamache shared Richard Gamache's intent to shoot and kill the Williamses. He argued they knew Richard would carry out the shootings and they wanted him to: "And I think really what happened was—Richard was the shooter, because I think Andre and Tammy knew he had some propensities along those lines, and they let him do the dirty work. He didn't mind doing the dirty work. But I submit to you if he hadn't, they would have done it, but that was his job in this conspiracy, and they expected him to do it."

Gamache argues there was no evidence in the record to show he had "propensities along those lines." The argument is preserved, as Gamache objected in the trial court. However, the prosecutor's argument was not misconduct, nor did it prejudice Gamache in any way. It went to whether Gamache's codefendants had reason to know Gamache would intentionally shoot the Williamses—an issue contested by his codefendants—but it had no bearing on any contested guilt phase issue, as Gamache conceded he intentionally shot the Williamses.

(3) At the start of his rebuttal closing argument, the prosecutor expressed his disbelief at the arguments of Gamache's counsel: "As to Richard Gamache, the argument made by [defense counsel]. I was flabbergasted that he argued you shouldn't find the special circumstance[s] true, because, after all, the killing had nothing to do with the robbery, and the burglary and the kidnapping." He went on to explain in detail why, in his view, the evidence supported the conclusion that Gamache had committed an intentional murder in the course of robbery, burglary, and kidnapping, and why the jury therefore should find the corresponding special circumstances true.

Gamache takes umbrage at the use of the word "flabbergasted," but has forfeited any claim by failing to object at trial. Nor does the prosecutor's word choice carry him outside the wide latitude afforded counsel at argument; the prosecutor did not ask the jury to decide the case based on his own personal opinions of the merits of Gamache's arguments, but rather on the evidence in the record that might refute them.

(4) Later in his rebuttal, when discussing evidence that for Gamache the murder had been intertwined with—not independent of—the other crimes, the prosecutor read from a transcript of Peggy Williams's earlier trial testimony about the burglary: " 'Q. Tell us what Richard said. [¶] A. They asked [Lee] his name—Richard asked him his name. [¶] Q. And what did Lee say? [¶] A. He said, "Lee Williams." Asked him where Lee worked, and Lee said, "Southern California Edison." And the response to that, I don't know if it was the same person that asked Lee where he worked that came back with the response, but the response was "I should [blow] your fucking head off right now because I had a friend that just broke into Edison and was caught." ' [¶] Of course the interesting part of that sentence is the words 'right now' as opposed to, what, maybe an hour later or so. That takes care of Richard."

Gamache objects that the prosecutor insinuated it was Gamache who said, "I should [blow] your fucking head off right now because I had a friend that just broke into Edison and was caught," when no evidence in the record supported that conclusion. This claim is preserved, as Gamache's codefendant objected and the trial court overruled the objection before Gamache had a chance to join; accordingly, it would have been futile to make the same objection that had just been rejected. However, the claim is without merit: the prosecutor read aloud the portion of the transcript where Peggy Williams indicated she did not know who the speaker was, counsel for Gamache's codefendant pointed out there was no evidence who the speaker was, and the trial court denied the objection with the understanding the jury was necessarily aware Peggy Williams had been uncertain who the speaker was. Nothing in the prosecutor's remarks was likely to prevent the jury from deciding for itself to whom, if anyone, these remarks should be attributed.

(5) Turning to the evidence supporting Tammy Gamache's intent, the prosecutor conceded: "Tammy did, in fact, lead them to the body. I don't quite view the interpretation that way—same way [defense counsel] does [that Tammy Gamache did not want Lee Williams to die]. [I] [f]ind it curious that she knew exactly where to take the police, and—well, *there are all sorts of other things I could go into*, but that, that shows her knowledge of the shooting to be a far greater level than he would have you believe, I think." (Italics added.)

Gamache argues the prosecutor was implying he was privy to evidence outside the record that would further support defendants' guilt. No objection was made; the argument is forfeited. Moreover, in context, it is clear the prosecutor was alluding to other evidence in the record that would also establish Tammy Gamache was a full participant in the charged crimes; the remark had nothing to do with Richard Gamache. There is no reasonable likelihood the jury would have understood the comment in any other way.[11]

Whether they are considered individually or collectively, we conclude Gamache has not shown the prosecutor's remarks in his guilt phase closing argument constituted misconduct.

### D. Inference of Guilt from Possession of Stolen Property (CALJIC No. 2.15)

The trial court instructed the jury with a version of CALJIC No. 2.15, covering the inferences to be drawn from possession of recently stolen property, which had been modified to include the various crimes with which the three codefendants were charged.[12] Gamache contends this instruction was flawed in two ways: (1) It allowed inferences to be drawn (that Gamache had committed special circumstance murder, kidnapping, robbery, and burglary) that were in no way rationally connected to the provable facts (that Gamache possessed stolen property); and (2) it lessened the prosecution's burden of proof, incorrectly permitting the jury to find him guilty of murder,

---

[11] Gamache also mixes in with his guilt phase closing argument claims an objection to one remark the prosecutor made to a panel of prospective jurors during voir dire. Underlining the jury's responsibility to follow the court's instruction not to consult outside sources, the prosecutor had noted: "You can tell a lot of money has been spent on this case just to get it this far. And to have to do it all over again is a catastrophe." Gamache forfeited the claim by not objecting in the trial court. In any event, the claim is meritless; Gamache has not shown any reasonable likelihood the jurors would have remembered this remark and used it as a basis to disregard the countless subsequent instructions they received governing the manner in which they were to decide the case.

[12] The instruction provided: "If you find that a defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendants are guilty of the crime of murder, robbery, burglary, and kidnapping for robbery. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession—time, place, and manner, that the defendant had an opportunity to commit the crime charged; the defendant's conduct; his false or contradictory statements, if any; and/or other statements that he or she may have made with reference to [the] property; or a false account of how he or she acquired possession of the stolen property; or any other evidence which tends to connect the defendant with the crime charged."

robbery, burglary, and kidnapping for robbery based on only slight corroborating evidence above and beyond his possession of stolen property.[13] Accordingly, he contends his federal due process rights were violated. (U.S. Const., 14th Amend.) While we agree the trial court partially erred in how it worded its instruction, that error was manifestly harmless.

■ CALJIC No. 2.15 is an instruction generally favorable to defendants; its purpose is to emphasize that possession of stolen property, alone, is insufficient to sustain a conviction for a theft-related crime. (*People v. Yeoman* (2003) 31 Cal.4th 93, 131 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; *People v. Mendoza* (2000) 24 Cal.4th 130, 176–177 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Johnson* (1993) 6 Cal.4th 1, 37 [23 Cal.Rptr.2d 593, 859 P.2d 673]; cf. *People v. Najera* (2008) 43 Cal.4th 1132, 1135–1136 [77 Cal.Rptr.3d 605, 184 P.3d 732] [defendant argued he was prejudiced because the trial court had a *duty to give* CALJIC No. 2.15 sua sponte in all theft-related cases and failed to do so].) In the presence of at least some corroborating evidence, it permits—but does not require—jurors to infer from possession of stolen property guilt of a related offense such as robbery or burglary. We have held the instruction satisfies the due process requirement for permissive inferences, at least for theft-related offenses: the conclusion it suggests is " 'one that reason and common sense justify in light of the proven facts before the jury.' " (*Yeoman*, at p. 131; see also *People v. Parson* (2008) 44 Cal.4th 332, 356 [79 Cal.Rptr.3d 269, 187 P.3d 1].) Accordingly, we have repeatedly upheld the giving of the instruction in such cases (*Parson*, at pp. 355–357 [instruction is appropriate for robbery, burglary, and other theft charges]; *People v. Prieto, supra*, 30 Cal.4th at pp. 248–249 [instruction is appropriate for use in theft cases]; *Yeoman*, at pp. 131–132 [instruction is appropriate in robbery case]), and Gamache offers us no reason to reconsider that conclusion.

On the other hand, we have also cautioned that the instruction is inappropriate for non-theft-related crimes, and instructing that possession of stolen property may create an inference that a defendant is guilty of murder, as was done here, is error. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Prieto, supra*, 30 Cal.4th at pp. 248–249.) The People concede as much.[14]

---

[13] The People contend Gamache forfeited this argument by failing to object at trial. Section 1259 permits appellate review of claimed errors to the extent they "affected the substantial rights of the defendant." Accordingly, to the extent this claim of instructional error is meritorious and contributed to Gamache's conviction and death sentence, we will review it. (See *People v. Bonilla, supra*, 41 Cal.4th at p. 329, fn. 4; *People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

[14] Gamache also argues it was error to allow the jury to infer that any of the special circumstances were true based on his possession of stolen property. The instruction did not do so; the inference it permitted extended only to the conclusions that defendants were "guilty of

█ As for Gamache's second argument, that CALJIC No. 2.15 impermissibly alters the burden of proof, we have previously rejected it. The instruction does not establish an unconstitutional mandatory presumption in favor of guilt (*People v. Yeoman, supra,* 31 Cal.4th at p. 131) or otherwise shift or lower the prosecution's burden of establishing guilt beyond a reasonable doubt (*People v. Parson, supra,* 44 Cal.4th at pp. 355–356; *People v. Prieto, supra,* 30 Cal.4th at p. 248). Gamache offers no persuasive reason to reconsider these conclusions.

Though Gamache argues that error in giving CALJIC No. 2.15 is either structural or subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], it is well established the *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], test applies. (*People v. Parson, supra,* 44 Cal.4th at pp. 357–358; *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 101; *People v. Prieto, supra,* 30 Cal.4th at p. 249.) Under that test—whether it is reasonably probable Gamache would have obtained a more favorable result had the instruction not been given—the error here in extending CALJIC No. 2.15 to the murder charge was clearly harmless. Copious evidence, aside from Gamache's being caught with the Williamses' property hours after Lee Williams's death, established he had intentionally shot and killed Lee Williams. Most prominently, Peggy Williams testified Gamache had done so, and codefendant Andre Ramnanan introduced Gamache's admission that he had shot Lee Williams. Indeed, counsel during closing argument conceded that Gamache was guilty of murder.

## II. *Sanity Phase Claim: Withdrawal of Not Guilty by Reason of Insanity Plea*

On July 25, 1995, Gamache entered a plea of not guilty by reason of insanity. On September 25, he withdrew that plea. He now argues (1) the plea withdrawal was not knowing and intelligent, and (2) the trial court breached a sua sponte duty to conduct further inquiry before accepting the withdrawal, thereby violating his due process rights (U.S. Const., 14th Amend.). Accordingly, he argues, the plea should be reinstated and he should receive a new sanity phase trial.

█ The standards for accepting withdrawal of a not guilty by reason of insanity plea are settled. If the trial court has no doubt about a defendant's present competence, and if the experts who have examined the defendant are unanimous in finding him or her sane at the time of the crime, a trial court may freely accept a defendant's withdrawal of an insanity plea. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1213–1214 [259 Cal.Rptr. 669, 774 P.2d 698];

---

the crime of murder, robbery, burglary, and kidnapping for robbery." Accordingly, there was no error in connection with the jury's special circumstance findings.

*People v. Guerra* (1985) 40 Cal.3d 377, 384 [220 Cal.Rptr. 374, 708 P.2d 1252]; *People v. Redmond* (1971) 16 Cal.App.3d 931, 939 [94 Cal.Rptr. 543]; cf. *People v. Merkouris* (1956) 46 Cal.2d 540, 553–555 [297 P.2d 999] [abuse of discretion to accept withdrawal of an insanity plea where experts are split on sanity].) No *Boykin-Tahl* advisements[15] concerning the rights being relinquished are required. (*Bloom*, at p. 1214; *Guerra*, at p. 384.) In the absence of doubt about a defendant's competence, a trial court has no sua sponte duty to inquire further into the reasoning behind the defendant's decision.

Here, the trial court had received the written reports of three different experts, Drs. James Hawkins, Michael Kania, and Harvey Oshrin. All three examined Gamache and concluded he was sane. The trial court expressed no doubts about Gamache's competence on the record. Gamache's lead counsel offered that both he and cocounsel had consulted with Gamache concerning the contents of the psychological and psychiatric evaluations in the case, and in light of the fact all examining experts had concluded he was sane, Gamache intended to withdraw his not guilty by reason of insanity plea. A colloquy followed in which Gamache confirmed on the record that he had consulted with counsel, personally joined with both his counsel in asking the court to withdraw his plea, and understood he was surrendering the possibility of avoiding a penalty phase trial were he to be found insane by a jury. In the absence of any ground for doubt about Gamache's sanity, the trial court was required to do no more before accepting Gamache's withdrawal of his plea.

Gamache argues there was error in the acceptance of his plea withdrawal because one month later, a fourth expert, Dr. Lorna Forbes, issued an opinion concluding Gamache was in fact legally insane. From this, Gamache reasons his trial counsel must have lied to him about every examining expert finding him sane, and rendered incompetent representation in counseling him about withdrawal of his plea.

To the extent Gamache frames acceptance of his plea withdrawal as trial court error, nothing in the record up to and including the September 25, 1995, hearing at which Gamache withdrew his plea put Gamache's sanity in doubt. Presented with expert unanimity, the trial court was under no obligation to inquire whether there were still other defense experts who might at some point in the future reach a different conclusion.[16] To the extent he frames the

---

[15] *Boykin v. Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].

[16] Gamache highlights that, later in the September 25 hearing, after he had withdrawn his plea, defense counsel mentioned, in the course of discovery discussions, another expert who might eventually testify but whose report likely would not be completed for several weeks. The trial court was under no obligation to inquire whether the expert might eventually opine about

plea withdrawal as a consequence of defense counsel error—and, notwithstanding accusations of incompetent representation, Gamache apparently disavows a formal ineffective assistance of counsel claim—the record is inadequate for us to resolve such a claim in Gamache's favor on direct appeal. We do not know what defense counsel did or did not know about Dr. Forbes's views as of the September 25 hearing, nor what Dr. Forbes's initial views, if any, may have been, nor what tactical considerations may have played into the decision to advise Gamache to forgo a sanity phase trial. As the burden is on Gamache to affirmatively demonstrate error, in the absence of evidence his claim must fail. (*People v. Ledesma* (2006) 39 Cal.4th 641, 746 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

### III. *Penalty Phase and Sentencing Claims*

#### A. *Impact of Cumulative Guilt Phase Error on the Penalty Phase*

Gamache contends that if we do not conclude any individual guilt phase error mandates guilt phase reversal, the cumulative effect of the guilt phase errors nevertheless rendered the penalty phase trial unreliable. We disagree. We have identified only a single guilt phase error, in the wording of CALJIC No. 2.15 as given. As we have explained, that error had no impact on the guilt verdict. Nor has Gamache shown how it possibly could have affected the penalty phase verdict. (See, e.g., *People v. Martinez* (2010) 47 Cal.4th 911, 959–960 [224 P.3d 877].)

#### B. *Denial of Severance Motion/Redaction of Gamache's Statements*

During the penalty phase, Gamache's codefendants, Andre Ramnanan and Tammy Gamache, objected to the introduction of unredacted out-of-court statements Richard Gamache had made to mental health experts on the ground those statements tended to incriminate them. In the alternative, they sought severance.[17] (See *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*).) "*Bruton* and its progeny provide that if the prosecutor in a joint trial seeks to admit a nontestifying codefendant's

---

Gamache's sanity and whether, in light of that, and notwithstanding the immediately preceding colloquy, Gamache wished to proceed with the sanity phase trial scheduled to commence the very next day.

[17] Gamache eventually joined the severance motions.

extrajudicial statement, either the statement must be redacted to avoid implicating the defendant or the court must sever the trials." (*People v. Hoyos* (2007) 41 Cal.4th 872, 895 [63 Cal.Rptr.3d 1, 162 P.3d 528].) The trial court granted redaction and denied severance.

Gamache raises an *Aranda-Bruton* issue, but with a twist: he argues that by redacting his out-of-court statements to protect his codefendants' *Aranda-Bruton* rights, the trial court denied him his right to have his unredacted statements admitted, and the redactions painted Gamache in a much more unfavorable light by creating the impression that he was the ringleader and more culpable than his codefendants. The trial court, Gamache argues, should have granted severance or, at a minimum, refused redaction. We review the trial court's denial of severance for an abuse of discretion based on the record available to the trial court at the time. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 998 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

■ We recently addressed a claim identical to the one Gamache raises here: an assertion that redaction under *Bruton* and *Aranda* violated the rights of the speaking defendant by exaggerating his own culpability. (See *People v. Lewis* (2008) 43 Cal.4th 415, 456–460 [75 Cal.Rptr.3d 588, 181 P.3d 947].) Describing the trial court's duty to ensure the rights of the speaking defendant, we explained: "Severance may be necessary when a defendant's confession cannot be redacted to protect a codefendant's rights without prejudicing the defendant. (*Aranda, supra,* 63 Cal.2d at p. 530.) A defendant is prejudiced in this context when the editing of his statement distorts his role or makes an exculpatory statement inculpatory. (*People v. Douglas* (1991) 234 Cal.App.3d 273, 285–287 [285 Cal.Rptr. 609].) [¶] Ordinarily, in ruling on a severance motion, a trial court should review both the unredacted and the redacted statements to determine whether the redactions so distort the original statement as to result in prejudice to the defendant." (*Id.* at p. 457.)

■ Tammy Gamache and Andre Ramnanan objected to statements by Richard Gamache reflected in the psychiatric reports of defense experts Drs. Michael Kania and Lorna Forbes. The trial court reviewed these reports and evaluated whether any inculpatory statements (1) reflected matters already known to the jury through other evidence, (2) were prejudicial, and (3) could be redacted without distorting the bases for the experts' opinions. Gamache now takes issue with five redactions to Dr. Forbes's report, arguing that they effectively minimized his codefendants' culpability and exaggerated his own. We conclude the trial court did not abuse its discretion in making the redactions and instructing Dr. Forbes to limit her testimony accordingly, nor in concluding that a joint penalty trial could still proceed.

(1) The trial court redacted "and Andre" from the sentence: "Richard went on to discuss how he and Andre planned to kill his wife." Richard Gamache's implication of Andre Ramnanan in any plot to kill Tammy Gamache was plainly inadmissible under *Aranda-Bruton*. Gamache was not prejudiced by the deletion; Dr. Forbes testified about his statements to her solely as the basis for her opinions, not for the truth of the matters asserted therein, so Gamache would not have been able to argue that his out-of-court statement showed Ramnanan shared culpability for an inchoate crime unrelated to the Williams murder. Nor was Gamache prejudiced by the trial court's refusal to simply delete the entire sentence; as counsel and the trial court noted, Forbes's report contained numerous other references to Gamache's stated intent to kill Tammy, as well as to an incident where Gamache had rolled his truck at high speed while Tammy was a passenger, breaking her back and causing her to accuse him of trying to kill her.

(2) The trial court redacted "and Andre" from a second statement about another unrelated inchoate crime: "He went on to tell me how he and Andre had planned to kill two days prior 'a whole family, the Lowes, some people in the occult (cult).' " Again, the reference to Andre Ramnanan was inadmissible under *Aranda-Bruton*; again, Gamache was not prejudiced because he was not entitled to rely on the statement for the truth of the matter asserted.

(3) The trial court deleted the statements: "The horses were her (Tammy) idea. (Later he denies this.)" Gamache's out-of-court inculpation of Tammy Gamache was inadmissible under *Aranda-Bruton*; Gamache was not prejudiced by its omission because, inter alia, the trial court also omitted his renouncing of the statement and because the jury had already heard copious evidence that Tammy was the one of the three who was interested in riding horses.

(4) The trial court deleted the statement: "[H]e acknowledged that she [Tammy Gamache] very much participated in the theft, homicide, kidnapping, etc." Again, the statement was plainly inadmissible under *Aranda-Bruton*. Gamache was not prejudiced by its omission because he could not have used it for the truth of the matter asserted to argue Tammy Gamache's culpability; moreover, the jury had already heard (and believed, given that it returned a first degree murder conviction with special circumstances against her) copious evidence that Tammy Gamache had fully participated in the Williams murder and related crimes.

(5) The trial court advised Dr. Forbes that she should not refer to her statement in her report that "[i]t was planned to shoot them (victims of the incident now under litigation) from the beginning," but could say that "Richard said he planned to shoot them" from the beginning, if that was in

fact what Richard had said. As with the other statements, Gamache's implication of his codefendants in the Williams shootings was inadmissible under *Aranda-Bruton*, and the trial court was obligated to redact or revise it if it chose to proceed with a joint trial. Both the original and modified statements acknowledged Gamache's understanding that the plan was always to shoot the Williamses. Moreover, as with the other redacted statements, the statement here was inadmissible for the truth of the matter asserted. Given that the jury was instructed to, and obligated to, give individualized sentencing determinations to each defendant, any prejudice from the jury's being prevented from hearing statements that might raise Gamache's codefendants' culpability without significantly changing his own was minimal at most.[18]

▮ Considering any cumulative prejudice from these redactions, we conclude the trial court did not abuse its discretion by refusing severance. Section 1098 establishes a clear legislative preference for joint trials where, as here, multiple defendants are charged with the same crimes against the same victims. (*People v. Tafoya* (2007) 42 Cal.4th 147, 162 [64 Cal.Rptr.3d 163, 164 P.3d 590]; *People v. Box* (2000) 23 Cal.4th 1153, 1195 [99 Cal.Rptr.2d 69, 5 P.3d 130].) A trial court retains discretion to order severance " ' "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*Box*, at p. 1195.) Gamache's objection is none of these; rather, it is that the redactions required under *Aranda-Bruton* prevented him from getting in, by way of his experts, his out-of-court statements incriminating his codefendants and thereby prevented him from (impermissibly, we note) using these statements for the truth of the matter asserted to argue his codefendants' greater culpability. Indeed, in response to the redactions, Gamache's counsel threatened to have Gamache take the stand himself to incriminate his codefendants. Gamache was not entitled to use his experts' reports in this fashion, and the trial court was not required to accommodate this strategy by declining redaction or ordering severance.

Finally, Gamache argues that even if the denial of severance was not error at the time, reversal is still required because proceeding with a joint trial "caused such ' "gross unfairness" ' as to violate [his] due process rights." (*People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 998; see U.S. Const., 14th Amend.) Aside from the redactions already discussed, the only gross

---

[18] Gamache also objects to the failure to redact from one of Ramnanan's expert's reports the statement "Richard came out [of the Williams residence] with her [Tammy]." The statement could not possibly have prejudiced Gamache in any way; as the trial court pointed out at the time, the jury was fully aware that the various codefendants left and reentered the Williams residence on several occasions, and no material issue hinged on this accepted fact.

unfairness he identifies is the opportunity the joint trial afforded his codefendants to blame him. This is a common concomitant of a joint trial; it is the reverse of the opportunity severed trials afford former codefendants to put forward an "empty chair" defense, in which all blame is heaped on the absent accomplice. What Gamache posits, in essence, is a constitutional right to separate penalty phase trials in all cases. We have never recognized such a right, and we decline to do so here. (Cf. *People v. Carasi* (2008) 44 Cal.4th 1263, 1311 [82 Cal.Rptr.3d 265, 190 P.3d 616] [no per se right to have penalty phase trials severed where defendants are of the opposite sex].)

## C. *Introduction of Gamache's Statements*

Gamache moved pretrial to suppress all statements he made to the police while in custody December 4 through 7, 1992, based on alleged violations of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] and *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] (hereafter sometimes *Miranda* and *Edwards*). The trial court held a seven-day evidentiary hearing and denied the motion in part, concluding that a December 7 videotaped police interview of Richard Gamache, Tammy Gamache, and Andre Ramnanan—the only statements by defendants the prosecution sought to use in its case-in-chief—was admissible. The court expressly reserved judgment on all other statements by Richard Gamache.

After the case was transferred from Barstow to San Bernardino for trial, the new trial judge reconsidered the suppression motion based on the record previously made. The trial court concluded Gamache had invoked his right to counsel on the morning of December 4, and on that basis many of Gamache's subsequent statements on December 4 were inadmissible. However, the court also found that Gamache, in the late afternoon of December 4, had voluntarily reinitiated contact with the police, demonstrated a willingness to talk about the case, and expressly waived his right to counsel; on that basis, the court ruled Gamache's statements from that point forward were admissible. Subsequently, after an Evidence Code section 402 hearing, the trial court also ruled admissible statements Gamache had made on December 5 to Deputy Sheriff Richard Ells while being booked.

The prosecution did not rely on any of Gamache's admissions during the guilt phase, but during the penalty phase introduced one statement by Gamache to the police from a December 4 joint interview, Gamache's December 5 statements to Deputy Ells, and a videotape of the December 7 joint interview of Richard Gamache, Tammy Gamache, and Andre Ramnanan. Gamache argues reliance on this evidence violated his privilege against self-incrimination. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) We conclude the trial court did not err in admitting any of the statements.

## 1. *Factual Background*

Gamache was arrested on the morning of December 4, 1992. Detective Tom Bradford began questioning him shortly after 9:00 a.m. He read Gamache his *Miranda* rights; Gamache waived them. Gamache denied any wrongdoing, saying the motor vehicles had been sold to him and his wife by a couple desperate for money. Twenty minutes into the interview, Bradford asked if Gamache would take a polygraph test; after some discussion, Gamache said: "OK, I do think before I take the polygraph I would like to talk to an attorney and just make sure. . . . I'd like to know what is going on before I answer any more questions."

Detective Bradford ended questioning, and he and Sergeant Brian English walked Gamache back to his jail cell. On the way, Gamache asked after his wife. Sergeant English replied that she was okay and sleeping; Detective Bradford told Gamache his wife was going to jail for murder, and she and Andre had given him up. Detective Bradford testified this statement was untrue but was not intended to elicit a response. When they arrived at the jail booking area several minutes later, Detective Bradford provided Gamache with his business card, telling Gamache it was in case he changed his mind and wanted to talk to him. Gamache replied: "Fuck Andre and them. I was trying to protect them, but fuck them. Let's go back and talk. Sir, can we go back and talk?" Detective Bradford said, "You already told me you wanted an attorney present" or words to that effect. Gamache replied, "I changed my mind, let's go" or "No. I want to talk to you right now."

Detective Bradford returned Gamache to the interview room and continued the interview until approximately 10:10 a.m. Gamache confessed to robbing the Williamses and taking them out into the desert, but insisted Ramnanan was the shooter. Shortly before noon, Detective Kathy Caldwell, a polygraph examiner, interviewed Gamache; during the interview, he confessed to being the shooter. He was subsequently interviewed further by Sergeant English.

Gamache was then returned to his jail cell. Around 4:00 p.m., he summoned Detective Bradford and asked after his wife. He insisted she did not know anyone would be killed. He agreed to a joint interview with her. At 4:30 p.m., Richard Gamache, Tammy Gamache, and Thomas P. were jointly interviewed on camera; Detective Bradford advised them of their *Miranda* rights, which each waived. Richard Gamache confessed to shooting the Williamses and described the crimes in detail. That evening, Gamache was again advised of his *Miranda* rights, again waived them, and performed a reenactment of the crimes.

The next day, Gamache was booked by Deputy Ells. While fingerprinting Gamache, Ells asked whether he had been in the military and, finding he had, whether he had liked it. Gamache replied that he had enjoyed it and then said, "The only thing I love is guns and pussy and I have the best of both." He added: "I fucked up. I knew better. I should have used a .45." Ells asked what had happened; Gamache continued: "I shot her once. I saw her eyes flutter. I shot her again in the back of the head. I know the skull is thicker back there." Asked how he felt, Gamache said, "I almost got an erection." Ells asked about Lee Williams; Gamache replied: "I knew he was dead. I shot him and the blood came out of his head like you turned on a faucet."

On the morning of December 7, Richard Gamache, Tammy Gamache, and Andre Ramnanan appeared together for a joint interview on camera. At both the beginning and the end of the interview, Detective Bradford reminded them that they had previously been advised of their rights; they confirmed they understood those rights and still wanted to talk. The Gamaches and Ramnanan again confessed and described the crimes in detail.

### 2. Miranda *and Its Progeny*

*Miranda v. Arizona, supra,* 384 U.S. 436, and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed. (*People v. Davis* (2009) 46 Cal.4th 539, 585 [94 Cal.Rptr.3d 322, 208 P.3d 78]; see *Dickerson v. United States* (2000) 530 U.S. 428, 435 [147 L.Ed.2d 405, 120 S.Ct. 2326].) "If a suspect indicates 'in any manner and at any stage of the process,' prior to or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated." (*People v. Crittenden* (1994) 9 Cal.4th 83, 128 [36 Cal.Rptr.2d 474, 885 P.2d 887], italics omitted, quoting *Miranda v. Arizona,* at pp. 444–445.) Once the right to counsel has been invoked, further questioning is forbidden until counsel has been provided, "unless the suspect personally 'initiates further communication, exchanges, or conversations' with the authorities." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519], quoting *Edwards v. Arizona, supra,* 451 U.S. at pp. 484–485; see also *McNeil v. Wisconsin* (1991) 501 U.S. 171, 176–177 [115 L.Ed.2d 158, 111 S.Ct. 2204]; *People v. Storm* (2002) 28 Cal.4th 1007, 1021–1022 [124 Cal.Rptr.2d 110, 52 P.3d 52]; cf. *Maryland v. Shatzer* (2010) 559 U.S. ___ [175 L.Ed.2d 1045, 130 S.Ct. 1213].)

" 'An accused "initiates" ' further communication, exchanges, or conversations of the requisite nature 'when he speaks words or engages in conduct that can be "fairly said to represent a desire" on his part "to open up

a more generalized discussion relating directly or indirectly to the investigation." ' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 642 [21 Cal.Rptr.3d 612, 101 P.3d 509]; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 727 [94 Cal.Rptr.2d 396, 996 P.2d 46].) " '[W]here reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.' " (*People v. Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992]; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1311 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Thus, the People must show both that the defendant reinitiated discussions and that he knowingly and intelligently waived the right he had invoked. (*People v. Davis, supra,* 46 Cal.4th at p. 596.) If instead the police reinitiate discussion without a break in custody, any further statements by the defendant are presumed involuntary and rendered inadmissible. (*McNeil v. Wisconsin, supra,* 501 U.S. at p. 177; *People v. Storm, supra,* 28 Cal.4th at pp. 1021–1022.)

In reviewing the trial court's denial of a suppression motion on *Miranda-Edwards* grounds, "it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." (*People v. Cunningham, supra,* 25 Cal.4th at p. 992.) To the extent mixed questions of fact and law are present, they are reviewed de novo if predominantly legal and for substantial evidence if predominantly factual. (*People v. San Nicolas, supra,* 34 Cal.4th at p. 642; *People v. Waidla, supra,* 22 Cal.4th at p. 730.) The question whether it was the defendant or the police who reinitiated communications of the requisite nature, after the defendant's invocation of the right to counsel, is predominantly factual. (*People v. Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84].) Accordingly, we review it for substantial evidence. (*Waidla,* at p. 731.)

### 3. *Admissibility of the December 4 Statement and the December 7 Videotape*

Twenty minutes into his first interview with Detective Bradford on the morning of December 4, 1992, Gamache unequivocally asked to speak to an attorney before answering further questions. ("I do think before I take the polygraph I would like to talk to an attorney and just make sure. . . . I'd like to know what is going on before I answer any more questions.") Under *Edwards v. Arizona, supra,* 451 U.S. 477, therefore, the police were barred from asking Gamache further questions until counsel was present or until Gamache reinitiated discussions. As Gamache never received counsel during this initial questioning period, the critical question is whether, and if so when,

he reinitiated discussions with the police. The trial court found (1) Gamache's summoning of Detective Bradford around 4:00 p.m. on December 4 and (2) his unprompted discussion of his wife's involvement or lack thereof in the shooting showed a clear willingness and intention to talk about this case sufficient to satisfy the dictates of *Edwards*. It further found that shortly thereafter, at the beginning of his videotaped interview with his wife and Thomas P., Gamache knowingly and voluntarily waived his right to counsel.

These findings are supported by substantial evidence. The record is undisputed that Gamache asked to see Detective Bradford on the afternoon of December 4—that he, and not the police, initiated contact. Gamache had been repeatedly advised of his right to counsel over the course of the day; nothing about his decision to contact Bradford suggested it was the product of state pressure. Accordingly, "[t]he totality of circumstances show his decision to summon the investigators was not the result of coercion." (*People v. Sapp* (2003) 31 Cal.4th 240, 268 [2 Cal.Rptr.3d 554, 73 P.3d 433] [finding no *Edwards* violation where, after initially invoking the right to counsel, defendant thereafter unilaterally summoned investigators from his cell to talk about the case]; see also *People v. Mattson* (1990) 50 Cal.3d 826, 859–862 [268 Cal.Rptr. 802, 789 P.2d 983] [no *Edwards* violation where undisputed evidence shows it was defendant who asked to speak to the police].)

The record is also undisputed that Gamache, without prompting, raised the subject of his wife's involvement in the case, assuring Detective Bradford that she did not know anyone was going to be killed. This statement "can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.' " (*People v. Mickey, supra*, 54 Cal.3d at p. 648.) In *People v. Thompson* (1990) 50 Cal.3d 134, 163–164 [266 Cal.Rptr. 309, 785 P.2d 857], we concluded a defendant who raised the subject of his girlfriend (who was then incarcerated as a suspected accessory after the fact) in the hopes of having her released could be re-advised of his rights and asked about his crimes; so too here. Indeed, even a comment by a defendant that is as general as "What can I do to help you?" may, in context, be read as evincing a desire to discuss the case. (*People v. Waidla, supra*, 22 Cal.4th at p. 731; see also *People v. Mattson, supra*, 50 Cal.3d at pp. 861–862 [defendant's question about his car, which was connected with his offenses, was enough to establish a desire for conversation directly or indirectly related to the case].)

Gamache argues this case is akin to *People v. Boyer* (1989) 48 Cal.3d 247 [256 Cal.Rptr. 96, 768 P.2d 610], but *Boyer* is plainly distinguishable. There, after the defendant had clearly invoked his right to counsel, the *police investigator* called the defendant back into the interrogation room and "launched into a monologue on the status of the investigation," including an

assertion that a new witness had directly contradicted some of the defendant's previous statements. (*Id.* at p. 274.) These remarks were clearly a renewed interrogation (see *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 100 S.Ct. 1682] [interrogation includes remarks police should know are reasonably likely to elicit an incriminating response]) initiated by the police, not the defendant; in the face of them, the defendant crumbled and confessed. This case, where Gamache contacted Detective Bradford, and where Gamache, unsolicited, raised the subject of his wife's involvement, and where only then did the investigator inquire further about the case, bears no resemblance.

Finally, the record is undisputed that Gamache thereafter expressly waived his right to counsel at approximately 4:30 p.m., at the beginning of the December 4 interview with his wife and Thomas P. While Gamache argues this and subsequent waivers were not knowing, voluntary, and intelligent, the record supports the opposite conclusion. Gamache had his rights explained to him on numerous occasions; he recognized their value, invoking his right to counsel on at least one occasion. He demonstrated some sophistication about the legal process, immediately pointing out when Detective Bradford suggested a polygraph that any results would be inadmissible. His articulateness and demeanor during his videotaped interrogations suggest someone who had his wits about him. Contrary to Gamache's contention, neither Gamache's age nor the length of his incarceration (a matter of hours on Dec. 4; a few days by Dec. 7) renders any of his waivers involuntary. The record establishes a knowing, voluntary, and intelligent waiver of his rights. Accordingly, Gamache's statements after this point—including his statements to police in the December 4 joint interview and those on the December 7 interview tape—were admissible.[19]

### 4. *Admissibility of the Statements to Deputy Ells*

That Gamache was in custody while being booked and fingerprinted by Deputy Ells is undisputed. However, his statements to Ells were not the product of an interrogation. Accordingly, they were admissible.

■ " 'Interrogation' consists of express questioning, or words or actions on the part of the police that 'are reasonably likely to elicit an incriminating response from the suspect.' " (*People v. Cunningham, supra*, 25 Cal.4th at p. 993, quoting *Rhode Island v. Innis, supra*, 446 U.S. at p. 301.) "Interrogation thus refers to questioning initiated by the police or its functional equivalent, not voluntary conversation. [Citation.] ' "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." ' " (*People v.*

---

[19] Gamache again acknowledged waiving his rights at the beginning of the December 7 joint interview.

*Thornton* (2007) 41 Cal.4th 391, 432 [61 Cal.Rptr.3d 461, 161 P.3d 3], quoting *Rhode Island v. Innis,* at p. 300.) Consequently, the police "may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." (*People v. Clark* (1993) 5 Cal.4th 950, 985 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Under these rules, smalltalk is permitted. Thus, we have concluded that a detective who told a defendant during booking that he "looked 'like a traffic ticket' " and asked " 'Is it just a warrant?' " was not engaged in an impermissible custodial interrogation. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1034 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Deputy Ells's remarks were even more innocuous; objectively, there was no reason to suspect that inquiring about Gamache's military service would lead Gamache to volunteer his regret about failing to kill Peggy Williams or the other inflammatory remarks that followed. Deputy Ells's subsequent " 'neutral inquir[ies]' " did not convert Gamache's volunteered admissions into the product of interrogation. (*People v. Ray* (1996) 13 Cal.4th 313, 338 [52 Cal.Rptr.2d 296, 914 P.2d 846].) The trial court did not err in admitting them.

### D. *Prosecutorial Misconduct: Penalty Phase Closing Argument*

Gamache argues the prosecutor committed numerous instances of misconduct in his penalty phase closing argument, depriving him of his rights to due process and a fair trial, inter alia. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16.) We apply the same substantive standards as for Gamache's guilt phase prosecutorial misconduct claim. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1153 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Valdez* (2004) 32 Cal.4th 73, 132 [8 Cal.Rptr.3d 271, 82 P.3d 296]; see, *ante,* pt. I.C.)

Preliminarily, Gamache never objected to any of the prosecutor's closing argument. Notwithstanding his "ritual incantation" (*People v. Panah, supra,* 35 Cal.4th at p. 462) that a jury admonition would have made no difference, Gamache identifies nothing in the record to suggest this would have been so. Accordingly, these claims are forfeited.

Each also fails on its merits:

(1) The prosecutor told the jury: "Well, and [defense counsel] kind of took issue when I used the expression[,] you're the conscience of the community in your decision. [¶] Well, in a way the people who urge the comparative filth argument on you are acknowledging that because they're saying, there is a standard in our community about how serious a murder should be before it deserves the death penalty. [¶] And you are the people that are going to set that standard, and you are the conscience of the community in setting that standard."

██ Gamache objects to characterizing the jury as the "conscience of the community" on the ground it would likely cause the jury to substitute what they perceived to be the community's views for their own. We have on numerous occasions considered this turn of phrase and rejected the contention that it invites jurors to abrogate their personal responsibility to render an appropriate verdict in light of the facts and the law. Jurors *are* the conscience of the community: "[A] jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 519 [20 L.Ed.2d 776, 88 S.Ct. 1770], fn. omitted.) It is not error to tell them so in closing argument. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1178 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Ledesma, supra,* 39 Cal.4th at p. 741; *People v. Lucero* (2000) 23 Cal.4th 692, 733–734 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Jones* (1997) 15 Cal.4th 119, 185–186 [61 Cal.Rptr.2d 386, 931 P.2d 960].)

(2) The prosecutor asked the jury, in considering whether to exercise mercy toward Gamache and his codefendants, to consider whether they afforded the Williamses any mercy: "And sympathy and mercy, they can, we all know it, I think everybody knows it, they can be some of the most wonderful and beautiful things in the universe. It's what makes us human. It's [what] make[s] us less than animals [*sic*]. [¶] But mercy is also, it's not garbage to be thrown around the road rampant. It has to be used appropriately in situations that are appropriate for people that are appropriate. You just use it randomly [and] it's meaningless. [¶] So when you're considering whether to give sympathy or mercy to Richard, to Tammy, to Andre, I want you to think about how they in the same situation pretty much acted towards their victims. [¶] . . . [¶] Look at these people and decide whether they're worthy of your mercy, considering how they've acted towards other people."

██ Gamache argues this was misconduct because it appealed to the jurors to act out their passions and prejudices, rather than exercising guided discretion. Not so. The prosecutor's argument called for the jury to keep firmly in mind the circumstances of the crimes (§ 190.3, factor (a)) when deciding whether to grant Gamache and the other defendants mercy. We have repeatedly approved prosecutors arguing that a defendant is not entitled to mercy, and in particular arguing that whether the defendant was merciful during the crimes should affect the jury's decision. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1181 [95 Cal.Rptr.3d 652, 209 P.3d 977]; *People v. Kennedy* (2005) 36 Cal.4th 595, 636 [31 Cal.Rptr.3d 160, 115 P.3d 472]; *People v. Vieira* (2005) 35 Cal.4th 264, 296 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *People v. Benavides* (2005) 35 Cal.4th 69, 107–109 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Hughes* (2002) 27 Cal.4th 287, 395 [116 Cal.Rptr.2d

401, 39 P.3d 432]; *People v. Ochoa* (1998) 19 Cal.4th 353, 464–465 [79 Cal.Rptr.2d 408, 966 P.2d 442].) We do so again today.

(3) The prosecutor addressed Gamache's mental health defense thusly: "In a nutshell[,] you heard enough cross-examination and examination, psychiatrists just have a different perspective than people in your position, I think. [¶] To psychiatrists[,] the subtle motivations that go on in people's minds are really critical and that's what dictates whether they're mentally ill and whether that should be considered legally. [¶] Under the law the important concept is impairment, and we talk[ed] about that with a number of the mental health experts. [¶] It really doesn't matter what's wrong with you if it wasn't impairing your thinking at a given point in time. [¶] And I think everybody in this room realizes there is a lot wrong with Richard Gamache, but in terms of, for instance, during the crimes in this case he knew perfectly well what he was doing, intended to kill him and did it for perfectly logical reasons. [¶] If his subtle motivations were problems he had with his mother or somebody else, or the Army, that's fine for psychiatrists; but whether that should weigh very heavily in your decision, whether that's a serious factor in mitigation, that's something for you to decide. [¶] By the way, now that you've been through this trial the expression 'psycho babble' will never mean the same thing to any of you, I'm sure."

 Gamache takes issue with this argument, contending it unfairly injected the prosecutor's personal opinions into the case, was not based on any evidence, implied that the prosecutor's skepticism of the defense experts' testimony was based on a secret source of knowledge, and was unduly disrespectful. Considering this argument as a whole, we find nothing in it exceeding counsel's wide latitude in closing argument. The prosecution is permitted to question whether a defendant's mitigating evidence should carry much weight. (*People v. Salcido* (2008) 44 Cal.4th 93, 159 [79 Cal.Rptr.3d 54, 186 P.3d 437].) This principle extends to mental health evidence; a prosecutor is entitled to argue, as the prosecutor did here, that notwithstanding any expert testimony about mental illness, the defendant was not in fact significantly impaired during the crimes he committed. (*People v. Jones, supra,* 15 Cal.4th at pp. 186–187.) The jury had considerable lay testimony it could consider on this question, including Peggy Williams's description of Gamache's actions and Gamache's own confession just days later; thus, the prosecutor's closing argument neither rested on matters outside the record, nor implied secret evidence to which only he was privy, nor injected personal opinion.[20]

---

[20] Additionally, Gamache takes issue with the prosecutor's cross-examination of Gamache's defense experts, describing his treatment of Dr. Forbes as "argumentative and obnoxious" and criticizing the examination of Dr. Kania for focusing on Gamache's answers to the Minnesota Multiphasic Personality Inventory (MMPI) in an effort to portray Gamache as a liar. The prosecution was entitled to explore the basis for any expert's opinion (Evid. Code, § 721,

Considering the various claims of misconduct individually and cumulatively, we find that nothing in the prosecutor's penalty phase closing argument deprived Gamache of any of his state or federal constitutional rights.

### E. *Ineffective Assistance of Counsel During the Penalty Phase Closing Argument*

 Gamache contends his defense counsel rendered ineffective assistance of counsel during the penalty phase closing argument. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.) We apply settled standards: "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland v. Washington, supra,* at p. 687; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [124 Cal.Rptr.2d 473, 52 P.3d 656].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello[, supra,]* 15 Cal.4th [at p.] 266 . . . .)" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 [135 Cal.Rptr.2d 553, 70 P.3d 981].) These standards apply with particular force at closing argument because, as we have recognized, "[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical . . . ." (*People v. Freeman* (1994) 8 Cal.4th 450, 498 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

Defense counsel's closing argument reveals a two-part strategy: to convey to the jury that this case was not the worst of the worst, based both on the more extreme facts of other well-known cases and on the mitigating evidence (principally the uncontradicted mental health expert testimony) here; and to

---

subd. (a)(3)); in Dr. Kania's case, this included Gamache's answers to the MMPI. *People v. Visciotti* (1992) 2 Cal.4th 1, 80–81 [5 Cal.Rptr.2d 495, 825 P.2d 388], relied on by Gamache, *is* inapposite; there, we held it was misconduct to cross-examine a defense expert about, and thereby introduce the contents of, a study that had *not* been a basis for the expert's opinion. Nothing in this prosecutor's examination of these experts involved reprehensible tactics or rendered Gamache's penalty phase trial fundamentally unfair.

underline that life without the possibility of parole, especially for someone as young as Gamache, was itself a harsh punishment fully commensurate with the gravity of the crimes. Throughout his argument, counsel took steps to encourage juror acceptance of his arguments by candidly admitting the severity of Gamache's actions, thereby presenting himself as someone who was not blind to what Gamache had done, and portraying himself as someone who did not reflexively oppose death in all cases or view every excuse as sufficient to minimize one's culpability. This was a reasonable tactical approach; it was important that counsel present himself not as a lawyer who would say anything for his client, but rather as a credible source who, like the jury, was principally concerned with a just result—and who could credibly explain how choosing a life verdict would in fact be just.

Gamache contends defense counsel argued as if he were the prosecutor. In support of this claim, Gamache highlights, inter alia, that counsel expressed his unusual nervousness at the start of his argument; that, after describing in detail the crimes of various notorious serial killers, defense counsel conceded anyone, even he, would have voted for death in those cases; that he did not condone Gamache's actions, actions that had "effectively killed Peggy" Williams; that he would not argue Gamache lacked the intent to kill; that evidence of other crimes was just "frosting on the cake," and Gamache's conduct in December 1992 was enough to "bury him"; and, Gamache contends, he failed to argue that the evidence in aggravation was not so substantial in comparison to the mitigating evidence as to warrant death.

Neither the record nor the law supports Gamache's characterization of this argument as ineffective. Defense counsel emphasized his own nervousness, notwithstanding his long history of representing capital defendants, as a way of underlining for the jury the seriousness of his task and theirs: "So, if there's a tremor in my voice[,] I'm not afraid of you; I am concerned about my responsibilities, and I hope that you-all will be just as concerned with your responsibilities in this case." Defense counsel's description of the actions of serial killers like Ted Bundy and Richard Ramirez, the "Night Stalker," and his assertion that anyone, even he, would have found death appropriate in such cases, could be viewed as a way of establishing credibility with a jury composed of jurors willing to impose the death penalty in at least some cases, and fit within the larger apparent strategy of portraying Gamache's actions as not among the worst of the worst. Defense counsel's frank acknowledgement of the seriousness of Gamache's actions was likewise tactically justifiable; it might well have harmed counsel's credibility to argue to a jury that had already convicted Gamache of special circumstance first degree murder that Gamache lacked the intent to kill or that the impact of his conduct was not substantial. We have repeatedly recognized that sensible concessions are an acceptable and often necessary tactic. (E.g., *People v. Hart* (1999) 20 Cal.4th 546, 631 [85 Cal.Rptr.2d 132, 976 P.2d 683] [Concessions

are appropriate where the "surviving victim had testified in graphic detail regarding defendant's involvement in the charged offenses."]; *People v. Bolin* (1998) 18 Cal.4th 297, 334 [75 Cal.Rptr.2d 412, 956 P.2d 374] [overwhelming evidence of defendant's guilt, including eyewitness testimony, rendered concessions a "reasonable trial tactic"]; *People v. Lucas* (1995) 12 Cal.4th 415, 446–447 [48 Cal.Rptr.2d 525, 907 P.2d 373] [admission defendant was at the scene was a competent tactical choice given the state of the evidence]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1186–1187 [9 Cal.Rptr.2d 834, 832 P.2d 146] [same]; *People v. Jackson* (1980) 28 Cal.3d 264, 293 [168 Cal.Rptr. 603, 618 P.2d 149] [" '[G]ood trial tactics demanded complete candor' with the jury."].)

Having made tactically justifiable concessions, defense counsel did in fact argue that the prosecution's aggravating evidence, aside from the circumstances of the Williams shootings, was trivial and the mitigating evidence, especially the uncontradicted mental health testimony about Gamache's schizophrenia and severe mental disorder, was more than sufficient to warrant a life verdict. He stressed both the credibility of the experts and the prosecution's failure to present anyone to rebut them. He further emphasized to the jury that the weighing process was not a simple mathematical exercise in which 10 aggravating factors would inevitably outweigh one mitigating factor: "If you consider that factor in mitigation important enough to outweigh the factors in aggravation, no matter how aggravated they may be, that one factor in mitigation is enough to support your particular verdict of life without the possibility of parole. You don't need any more than that."

Gamache takes issue as well with defense counsel's treatment of two areas of mitigating evidence: his age and his difficult childhood. Counsel raised Gamache's age as a mitigating factor: "Another [mitigating factor], the age of the defendant at the time of the crime, that would be [section 190.3, factor] (i). And he was 18 years old. I've always wondered about that as a defense attorney because, you know, I guess if you're [18] years old you intend to kill somebody, what the hell difference does it make how young you are? [¶] But it's an area in mitigation and Richard Gamache was 18 years old at the time that this all went down." He then touched on Gamache's childhood: "Well, Richard Gamache, and even [the prosecutor] admitted that in his opening remarks to you, of all the three defendants he suffered a horrible, horrible childhood. [¶] His mother was a prostitute, narcotics addict. He was not raised, he was dragged up. I submit if [child protective services] had made the kind of inspection in that house that they should have made years ago Richard Gamache, a nice looking young man, would not have developed a mental defect or mental disorder that drove him to what he did in December of '92. [¶] His mother shares some of that blame, and I'm not the kind of an

attorney who says, hey, if your parents are bad that should inure to the benefit of the defendant. But by all, all standards and criteria his mother was not a mother."

Not every attorney would have chosen to address these mitigating circumstances in this fashion. But the decision to soft-pedal some aspects of the mitigating evidence, such as Gamache's age, and strongly emphasize others, such as the uncontradicted expert testimony about Gamache's mental illness, could reasonably have been the product of a tactical decision to bolster credibility with the jury by not appearing to argue that every permissible mitigating factor would suffice of itself to excuse Gamache's conduct. Counsel could decide to try to convey that if he argued Gamache's mental illness warranted sparing Gamache's life, it was because he really believed Gamache's mental illness warranted sparing his life, and not because he was the sort to argue that anything, such as age alone, was enough to excuse extreme conduct.

Finally, Gamache contends defense counsel's treatment of the mental health and catchall mitigating factors (§ 190.3, factors (d), (h), (k)) was too brief and superficial, and his discussion of the absence of prior felony convictions as a mitigating factor (*id.*, factor (c)) was wholly absent. As to the former, we have reviewed the transcript and conclude counsel's discussion was not so lacking as to fall below the constitutional minimum. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 634–635 [25 Cal.Rptr.2d 390, 863 P.2d 635] ["The effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality."]; *People v. Lewis* (2001) 25 Cal.4th 610, 675 [106 Cal.Rptr.2d 629, 22 P.3d 392]; *People v. Padilla* (1995) 11 Cal.4th 891, 949 [47 Cal.Rptr.2d 426, 906 P.2d 388]; *People v. Mayfield* (1993) 5 Cal.4th 142, 186–187 [19 Cal.Rptr.2d 836, 852 P.2d 331].) As to the latter, there are sound tactical reasons why counsel might choose not to dwell on the absence of prior felony convictions; given the prosecution's evidence that Gamache had participated in a violent takeover robbery of a pizzeria just weeks before the Williams shootings, the absence of any convictions could be seen as a simple artifact of Gamache's having turned 18 years old less than one year earlier, and touting those months without a conviction might come at the price of credibility with the jury.

In sum, while defense counsel's closing argument is not immune from criticism, it falls within the "wide range of reasonable professional assistance" (*Strickland v. Washington, supra*, 466 U.S. at p. 689) that is constitutionally tolerable.

F. *Introduction of an Extrinsic Videotape into the Jury Room During Penalty Deliberations*

1. *Erroneous Introduction of the December 4 Videotape*

In the weeks following the jury's return of its verdicts, it came to the attention of counsel and the trial court that, during the penalty phase deliberations, the jury had viewed a videotape never admitted into evidence. The tape showed a police interview of Richard Gamache, Tammy Gamache, and their juvenile coparticipant, Thomas P., on the afternoon of December 4, the day of the murders and arrests. Based on the jury's viewing of this extrinsic evidence, Gamache moved for a new trial. (§ 1181, subds. 2, 3 [new trial may be based on receipt of extrinsic evidence or juror misconduct].) The trial court denied the motion, concluding there had been no misconduct and the viewing of the videotape was not prejudicial. Gamache renews his claim of error before us, arguing he was deprived of his rights to confrontation, counsel, an impartial jury, and due process. (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16.)

The trial court's evidentiary hearing revealed the following. During the penalty phase, three videotapes were admitted into evidence: a tape of a December 7 police interview of Richard Gamache, Tammy Gamache, and Andre Ramnanan; a tape made by Tammy Gamache's mother; and a tape showing alleged misconduct by Andre Ramnanan in prison. Counsel had consented to have these tapes made available to the jury during deliberations. Court staff supplied the jury with a television and a videotape player, as well as three videotapes. Unfortunately, the third tape provided was not the Ramnanan tape, but the December 4 tape of Richard and Tammy Gamache and Thomas P. Like the admitted exhibits, the December 4 tape had been marked with a court exhibit tag during pretrial motions; unlike them, it had not been admitted during trial.[21]

The jury watched the December 4 tape in its entirety twice on the first or second day of its five days of deliberations, before any verdicts had been reached. Sometime later, it reached a verdict for Richard Gamache. After reaching a verdict for Richard Gamache, but before deciding on either codefendant, the jury fast-forwarded through the tape to replay two short segments to confirm a juror's recollection as to what was on the tape.

---

[21] The only reason the tape was not admitted is that codefendant Andre Ramnanan had been absent when the tape was made, having not yet been arrested. Accordingly, while everything on the tape could be used as an admission or adoptive admission against Richard and Tammy Gamache, *Aranda-Bruton* considerations would have required the prosecution to sever Ramnanan's trial at the penalty phase if it wanted to use the tape. (*Bruton, supra,* 391 U.S. 123; *Aranda, supra,* 63 Cal.2d 518; see also, *ante,* pt. III.B.)

Thereafter, the jury reached a verdict for Andre Ramnanan and deadlocked with respect to Tammy Gamache.

At one point in its deliberations, the jury asked to see the Ramnanan misconduct tape, the one omitted by court personnel. A bailiff assured them the Ramnanan misconduct was on one of the three tapes in the jury room. The trial court instructed them to fast-forward through the tapes they had received because the Ramnanan misconduct was on one of them.

## 2. *Standard for Evaluating Prejudice*

We review independently the trial court's denial of a new trial motion based on alleged juror misconduct. (*People v. Ault* (2004) 33 Cal.4th 1250, 1261–1262 [17 Cal.Rptr.3d 302, 95 P.3d 523].) However, we will " 'accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*Id.* at p. 1263.)

Introduction of the December 4 videotape into the jury room was indisputably error; the jury should not have been allowed to consider extrinsic evidence in reaching its verdict. (See *Turner v. Louisiana* (1965) 379 U.S. 466, 472 [13 L.Ed.2d 424, 85 S.Ct. 546] ["The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."]; *People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn. of George, C. J.).) The only issue, then, is whether the error was sufficiently prejudicial to warrant a new trial.

 Preliminarily, we consider Gamache's argument that the error was structural and therefore reversible per se. Error that occurs during the presentation of the case to the jury is generally trial error; an error that erroneously adds to or subtracts from the record before the jury can "be quantitatively assessed in the context of the other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 308 [113 L.Ed.2d 302, 111 S.Ct. 1246]; see also *People v. Allen* (2008) 44 Cal.4th 843, 870–871 [187 P.3d 1018, 80 Cal.Rptr.3d 183].) A court in such circumstances can meaningfully ask "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 113 S.Ct. 2078].) In contrast, structural errors not susceptible to harmless error analysis are those that go to the very construction of the trial mechanism—a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element. (See *Arizona v. Fulminante*, at pp. 309–310; *Sullivan v. Louisiana*, at pp. 280–281.)

Manifestly, the error here was trial error. The jury inadvertently had access to never-admitted evidence. This situation is no different than if the same

evidence had been proffered at trial and a valid objection to its admittance was erroneously overruled. (*People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865] ["The situation [where a jury innocently considers evidence it was inadvertently given] is the same as any in which the court erroneously admits evidence."].) We meaningfully may ask whether, in light of all the other evidence properly admitted, the verdict this jury reached would have been the same absent exposure to the December 4 videotape.

*U.S. v. Noushfar* (9th Cir. 1996) 78 F.3d 1442, amended (9th Cir. 1998) 140 F.3d 1244, on which Gamache places principal reliance, does not persuade us otherwise. In *Noushfar*, as here, the jury was allowed during deliberations to play 14 tapes never played in open court, in violation of federal rules guaranteeing the defendant a right to be present during the playing of any such tapes. (78 F.3d at p. 1444; Fed. Rules Crim.Proc., rule 43(a), 18 U.S.C.) The Ninth Circuit concluded the trial court's approval of this procedure over objection amounted to "a 'complete abdication of judicial control over the process' " (78 F.3d at p. 1445) and constituted structural error. However, the same court has subsequently limited *Noushfar* to its facts—specifically, that 14 tapes were involved, and the trial judge acquiesced in the error. (*Eslaminia v. White* (9th Cir. 1998) 136 F.3d 1234, 1237, fn. 1.) In *Eslaminia*, the Ninth Circuit considered a single tape in the jury room that contained admitted evidence on one side and, unbeknownst to all, unadmitted evidence on the other side—a situation far more analogous to the one here—and concluded the jury's consideration of the unadmitted portion of the tape was trial error subject to harmless error analysis: "[J]ury consideration of taped comments by a non-testifying party raises discrete evidentiary issues that the court may clearly identify and analyze, and is similar to other commonly-recognized trial errors." (*Ibid.*) With that analysis we agree.

█ We consider next whether the jury's consideration of the December 4 videotape resulted from any misconduct. Juror misconduct gives rise to a presumption of prejudice (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425 [58 Cal.Rptr.3d 368, 157 P.3d 973]); the prosecution must rebut the presumption by demonstrating "there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment" (*People v. Clair* (1992) 2 Cal.4th 629, 668 [7 Cal.Rptr.2d 564, 828 P.2d 705]; see *People v. Marshall* (1990) 50 Cal.3d 907, 949 [269 Cal.Rptr. 269, 790 P.2d 676]). In contrast, in the absence of misconduct, the burden remains with the defendant to demonstrate prejudice under the usual standard for ordinary trial error. (*Clair*, at p. 668; *People v. Cooper, supra*, 53 Cal.3d at p. 836.)

█ We have consistently pardoned jurors for considering extrinsic evidence that finds its way into the jury room through party or court error. In *People v. Cooper, supra*, 53 Cal.3d 771, a transcript never intended for the

jury's eyes was inadvertently marked as an exhibit, admitted, and sent to the jury room. The jury's consideration of the exhibit was only ordinary error: "When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct." (*Id.* at p. 836.) In *People v. Clair, supra,* 2 Cal.4th 629, a court clerk inadvertently supplied jurors with an unredacted audiotape and transcript of statements by the defendant to the police; portions of the conversation had been excluded by the court as irrelevant and unduly prejudicial. (*Id.* at p. 665.) Relying on *Cooper,* we again characterized consideration of this material as ordinary error, not misconduct. (*Clair,* at pp. 667–668.) And in *People v. Jackson* (1996) 13 Cal.4th 1164, 1213 [56 Cal.Rptr.2d 49, 920 P.2d 1254], a clerical error may again have resulted in the jury's receiving an unredacted transcript of the defendant's statements; even if so, the court's error did not equate to juror misconduct. (See also *People v. Jordan* (2003) 108 Cal.App.4th 349, 364 [133 Cal.Rptr.2d 434] [court's inadvertent submission of parole information to the jury was ordinary error]; *People v. Rose* (1996) 46 Cal.App.4th 257, 264 [53 Cal.Rptr.2d 559] [inadvertent receipt of a police report during deliberations was ordinary error].)

In contrast, we have found juror misconduct where a juror actively or passively obtains information about a case from *outside* sources. (E.g., *People v. Ramos* (2004) 34 Cal.4th 494, 518–520 [21 Cal.Rptr.3d 575, 101 P.3d 478] [consideration of outside newspaper articles during trial]; *People v. Danks* (2004) 32 Cal.4th 269, 306–307 [8 Cal.Rptr.3d 767, 82 P.3d 1249] [conversation with pastor about the case]; *People v. Nesler, supra,* 16 Cal.4th at pp. 579–580 [overhearing information about the case in a bar and revealing it to fellow jurors].) As we have explained, even though "inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term 'misconduct,' it nevertheless gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut." (*Nesler,* at p. 579.) As *Nesler* itself stressed, however, that presumption extends only to cases that involve the inadvertent receipt of outside information, and not to those where the court itself inadvertently furnished extrinsic information.

Here, the trial court found the jury's exposure to the December 4 videotape was accidental and solely the result of court staff error: "The jury got [the tape] through no fault of their own." (The court speculated the Dec. 4 tape might have been mistakenly slipped into the wrong videotape sleeve.) Accordingly, the court concluded there had been no juror misconduct: instead, "[i]t was inadvertence, mistake, and it was innocent . . . the jury was given this information, was told this was the evidence, the three tapes that they had were the evidence in the case, and therefore viewed it."

Gamache argues there was in fact misconduct. The jury had been instructed not to consider outside evidence (CALJIC No. 1.03) and should have recognized the December 4 tape was something they had not seen in the course of trial. Indeed, the jury foreperson testified he could not recall having seen the tape during trial. In these circumstances, Gamache argues, failing to stop the tape and advise the court and instead proceeding to view it multiple times was misconduct.

We disagree. The placement of the December 4 tape in the jury room suggested to the jurors it was something they were supposed to have; subsequent statements by the bailiff that they were supposed to have three videotapes and by the trial court that they were supposed to have videotapes would likely have cemented that belief. The jurors were not lawyers, nor were they privy to any stipulations the parties might have made about what could or could not be taken into the jury room. They thus had little reason to think the December 4 videotape was "outside" evidence they should not consider. Under *People v. Cooper, supra,* 53 Cal.3d 771, and its progeny, this was ordinary error. Accordingly, no presumption of prejudice applies. As the error occurred at the penalty phase of a capital trial, we ask "whether there is a reasonable *possibility* the error affected the verdict." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960–961 [44 Cal.Rptr.3d 237, 135 P.3d 649].)[22]

### 3. *Harmless Error Analysis*

We have reviewed in detail the December 4 videotape, comparing it with both the December 7 videotape—which was properly admitted and also provided to the jury in the jury room—and the entirety of the other evidence in the record. Preliminarily, we agree with the trial court that both the general subject matter and Gamache's demeanor were essentially the same on both the December 4 and the December 7 tapes. Each revealed Gamache as largely without emotion, indifferent to his actions, and frustrated or regretful only at failing to kill Peggy Williams and thereafter being caught. The ground covered by police questioning during the two interviews largely overlapped, though inevitably certain material was unique to each. Comparing those statements that appeared only on the December 4 tape with the rest of the admitted evidence, we find little that was new and nothing that would have changed the outcome of the trial. Accordingly, we conclude the error in making the December 4 videotape available to the jury did not prejudice Gamache; there is no reasonable possibility the outcome would have been different absent the error. (*People v. Gonzalez, supra,* 38 Cal.4th at pp. 960–961.)

---

[22] As we reiterated in *People v. Gonzalez, supra,* 38 Cal.4th at page 961, this standard is effectively identical to the *Chapman* standard for federal constitutional error (*Chapman v. California, supra,* 386 U.S. 18). Thus, our harmless error discussion covers both state and federal claims of error.

Gamache identifies seven portions of the December 4 tape he argues were new and prejudicial:

(1) Thomas P. was asked about a conversation he overheard between Ramnanan and Gamache before they left to go to the Williamses', a conversation about killing their victims. Thomas P. said he thought they were joking—a remark that benefited Gamache. Before he could further describe the conversation, however, Gamache interrupted and described it for him. Ramnanan and Gamache had been discussing their hopes that nothing would go wrong and there would be no accidents; Gamache had said it would "really break my heart" if there was an accident, and explained that he had been making a joke, as he often did, even about things that might seem "psychotic . . . sadistic, masochistic, whatever."

The trial court found no prejudice because the jury had already heard from two different sources evidence of Gamache's statements that indicated the shootings had always been planned. First, Donald Gray, an acquaintance of Ramnanan's, testified to overhearing a conversation between Gamache and Ramnanan while the three of them were taking target practice in the desert outside Yermo on the afternoon of December 3. According to Gray, Gamache and Ramnanan discussed stealing a trailer and said, "if the guy gave them any problems they were going to shoot them." Second, on the December 7 videotape, Gamache made statements that similarly confirmed planning, explaining his choice of gun: "The .38 was empty. There were no bullets in it. I was going to shoot them with the .38. I looked in it and there were no bullets in it. I stuck it in my coat pocket. I got the .32. I wanted to shoot the .38 cause I have hollow points for it."

We agree with the trial court. Moreover, the evidence that Gamache had always planned to kill the Williamses, whether they resisted or not, was overwhelming. Gamache and the others never consistently tried to hide their identities from the Williamses, as they would have had they ever intended to let them live. They turned off the lights and locked the house upon leaving the Williams residence (a pointless gesture that would not have delayed discovery of the crimes if they expected anyone to show up alive hours later), brought the Williamses only 1.4 miles out a desert road, and walked them less than 200 feet off the road with guns in their pockets and nothing with which to tie the Williamses up. These were not the actions of someone who shot the Williamses impulsively.

(2) Gamache described his actions between shooting Peggy Williams for the first and second times; while Peggy Williams lay on the ground, he shot her from behind, took her pulse, felt nothing, moved to the front of her to avoid hitting Ramnanan with a ricochet, and shot her again. As the trial court

recognized, Gamache had described these actions in similar terms during the December 7 interview: after he shot her once, he "[l]ooked at her eyes. Her eyes were still fluttering which showed me she still had brain activity and I shot her again and there was no REM. I went to take her pulse and I couldn't get a pulse on her. . . . If she wasn't dead, [with] two bullets in her head, I didn't think she would get up and walk away and talk to anybody. That's for goddamn sure. So we got up and left." Gamache told Deputy Ells during booking: "I shot her once. I saw her eyes flutter. I shot her again in the back of the head. I know the skull is thicker back there." Peggy Williams herself described Gamache and Ramnanan discussing whether she was dead or alive after she had been shot once, then checking her pulse, shining a light in her eyes, shooting her again, and walking away. The new fact that Gamache had changed angles before shooting Peggy Williams a second time would not have made any difference. Gamache does not persuasively argue otherwise.

(3) Asked if anyone had put a gun in Peggy Williams's mouth, Gamache said, "No, I don't think so." When asked whether that meant it could have happened, Gamache replied: "It could have. I don't know." We agree with the trial court's estimation that this equivocal denial concerning what might have happened during the crimes would have been accorded little, if any, aggravating weight by the jury and would not have affected the outcome.

(4) Gamache was asked if he, Tammy Gamache, and Ramnanan had worked out a story to tell in the event of their arrest. He replied: "Nope. Because it was clean. After they were shot we figured, well, oops!" He foresaw no problems because if she "had two bullets to her head that would make sure she was dead." Asked if he thought Peggy Williams was dead when they left, he said: "I should have used [the] .45. . . . I thought she was dead before I left. [If I had used it,] chances are [I] wouldn't be here right now."

Again, as the trial court recognized, these remarks were cumulative of other penalty phase evidence that showed Gamache regretted only his choice of weapon and not his decision to shoot the Williamses. Deputy Ells testified that when he was booking Gamache on December 5, Gamache told him: "I fucked up. I knew better. I should have used a .45." On the December 7 videotape, Gamache explained: "I know .32's will bounce off window shields of cars. But I was so tired I just didn't feel like going back for that .45. I know that .45 would of fucking made a major hole and only taken one shot. But I was so tired I wasn't registering [in] my mind what I was doing. It wasn't a perceived thought. It wasn't planned ahead to do it. But after I had done it I knew I should have used the .45. Just for good measure."

(5) At the close of the interview, the investigating officer sought to confirm for the record that Gamache had not been coerced to talk through threats or

intimidation. Gamache said he had not and then explained his decision to confess: "I . . . started to do a little thinking and I realized, fuck it, I'm going to fry anyway." This statement was not cumulative, but neither was it prejudicial. Given all the evidence, there was no reasonable possibility any juror who felt Gamache deserved a life sentence would have changed his or her mind simply because Gamache, in an offhand remark, indicated he thought he might well get a death sentence.[23]

(6) After the interview had concluded, Gamache offered an unsolicited remark to no one in particular: "If I figured, if I had any idea I was about to be arrested, I'd have started shooting." He elaborated: "See, I figure if I'm going to die, fuck, I'm going to take one or two with me." Evidence in the record showed Gamache wanted to be shot by the police. Dr. Kania testified that Gamache fantasized about dying on the field of honor, with one last rush of excitement, rather than continuing to live, feeling hopeless and empty. That he would have initiated a police shootout given the opportunity, then, would have come as no surprise to the jury. To the extent these statements presented new information, however, they were not prejudicial. Overwhelming evidence of Gamache's callousness toward human life was introduced during the penalty phase. Gamache's statements that he would have treated police officers seeking to arrest him the same way he treated the Williamses did not materially alter the profile the penalty phase evidence painted for the jury. Accordingly, there is no reasonable possibility exclusion of these statements would have made a difference in the outcome.

(7) Asked why he shot the Williamses, Gamache explained: "I don't think there was a reason. I think it was just lack of control. I didn't think about control. That split second. Either that or I got an adrenaline rush and my dick got hard. I can't tell." While Gamache argues that he was prejudiced by the introduction of his statement about his arousal, the statement was cumulative: The jury had already heard similar evidence establishing that Gamache was, or repeatedly joked about being, aroused by guns and by the Williams shootings. Detective Bradford testified to this exact statement by Gamache during the December 4 interview, telling the jury Gamache had said, matter-of-factly, "I don't know if I got an adrenaline rush or my dick got hard." Deputy Ells testified that when he booked Gamache on December 5, Gamache told him, "I almost got an erection" during the shootings. Dr. Forbes testified about Gamache having an erection in connection with the shootings. Dr. Forbes also testified Gamache believed he had been discharged from the military for writing that he got an erection when he got his M-16 rifle.

---

[23] Contrary to Gamache's current characterization of this remark, a reasonable juror would not have interpreted it as indicating Gamache thought he *deserved* death, only that that might be a likely outcome.

Considering the impact of these various remarks individually and collectively, in light of the other evidence already in the record, we conclude there is no reasonable possibility Gamache would have received a more favorable outcome had the December 4 videotape not been erroneously placed in the jury room.

G. *Denial of Automatic Application for Modification of the Death Sentence*

Gamache challenges the trial court's denial of his automatic application for modification of the jury's verdict. He contends the court deprived him of his due process and Eighth Amendment rights by (1) failing to independently review the evidence and penalty factors supporting the jury's findings, (2) overvaluing aggravating factors and undervaluing mitigating factors, (3) preparing a written tentative ruling in advance of the hearing on the application, and (4) soliciting no defense briefing. (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.) Gamache has forfeited these claims by failing to object contemporaneously. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1141 [81 Cal.Rptr.3d 614, 189 P.3d 880]; *People v. Wallace, supra*, 44 Cal.4th at p. 1096.) In any event, we find no error.

■ Every death verdict triggers an automatic application for modification of the sentence. (§ 190.4, subd. (e).) The trial court is obligated to review the evidence, independently reweigh any aggravating and mitigating circumstances, and determine whether the weight of the evidence supports the verdict. (*Ibid.*; *People v. Wallace, supra*, 44 Cal.4th at p. 1096; *People v. Alfaro* (2007) 41 Cal.4th 1277, 1334 [63 Cal.Rptr.3d 433, 163 P.3d 118].) In ruling on the application, the trial court must set forth reasons on the record and direct that they be entered in the clerk's minutes. (§ 190.4, subd. (e).) On appeal, we review the trial court's ruling independently, but it is not our role to redetermine the penalty in the first instance. (*Wallace*, at p. 1096; *People v. Geier* (2007) 41 Cal.4th 555, 616 [61 Cal.Rptr.3d 580, 161 P.3d 104].)

■ Here, the trial court's four-page, single-spaced statement of reasons belies Gamache's assertion that the court failed to independently review the evidence and consider fully any relevant aggravating and mitigating factors. The trial court expressly acknowledged its awareness of its obligations to "reweigh the evidence of aggravating and mitigating factors, and to determine whether, in the court's independent judgment, the weight of the evidence supports the verdict" and "assess the credibility of witnesses, determine the probative force of the testimony and weigh the evidence, including reviewing all the designated factors under Penal Code section 190.3." The trial court then did just that; it reviewed at length the circumstances of the crime, as supported by the weight of the evidence, and Gamache's prior unlawful

conduct. It considered against those aggravating factors Gamache's age, his difficult family history, his absence of prior felony convictions, and the expert defense testimony calling into doubt Gamache's sanity and ability to form the intent to kill. Weighing these factors, the court concluded the aggravating evidence substantially outweighed the mitigating evidence and the jury's verdict was warranted. The record leaves no doubt that the trial court here conscientiously carried out its obligations under section 190.4, subdivision (e). Contrary to Gamache's contentions, the trial court did not "ignore" the relevant mitigating factors; it simply did not find them dispositive. While section 190.4 and the state and federal Constitutions guarantee a defendant the right to have mitigating evidence considered, trial courts can and must sustain a jury's death verdict where, in their estimation, the evidence in aggravation so warrants. (*People v. Wallace, supra,* 44 Cal.4th at p. 1097 [trial court is not required to find the mitigating evidence does in fact mitigate]; *People v. Alfaro, supra,* 41 Cal.4th at p. 1334 [same]; *People v. Steele* (2002) 27 Cal.4th 1230, 1267–1268 [120 Cal.Rptr.2d 432, 47 P.3d 225] [same].)

As for Gamache's further procedural complaints about the denial of the motion, we have rejected each in the past, and Gamache presents no compelling reason for us to reconsider those conclusions. The trial court's preparation of a written tentative ruling in advance of the modification hearing was not error; as we have explained, a trial court may "study[] the merits of a motion in advance of the hearing and reach[] a tentative conclusion as to how the motion should be resolved." (*People v. Hayes* (1990) 52 Cal.3d 577, 645 [276 Cal.Rptr. 874, 802 P.2d 376].) Reducing that conclusion to writing is entirely acceptable: "To do so does not mean that the court is unalterably bound by the writing or that it will not amend or even discard the writing if counsel's arguments persuade the court that its tentative views were incorrect." (*Ibid.*; accord, *People v. Medina* (1995) 11 Cal.4th 694, 783 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Nor was the trial court required to demand argument or briefing in support of a modification motion. (*People v. Diaz* (1992) 3 Cal.4th 495, 575–576 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

### H. *Constitutionality of the Death Penalty for 18 Year Olds*

Gamache contends imposition of the death penalty for crimes committed as an 18 year old violates "Fundamental Notions of Justice." We disagree. Neither the Eighth Amendment and equal protection clause of the federal Constitution nor the corresponding provisions of the California Constitution per se prohibit death as punishment for crimes committed when 18 years of age. (See U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 17.)

We previously have rejected the argument that a death penalty scheme that treats differently those who are 18 years of age and older, and those younger than 18, violates equal protection. (*People v. Williams* (1988) 45 Cal.3d 1268, 1331 [248 Cal.Rptr. 834, 756 P.2d 221]; *People v. Turville* (1959) 51 Cal.2d 620, 638 [335 P.2d 678].) Indeed, the United States Supreme Court has concluded the federal Constitution draws precisely this line, prohibiting the death penalty for those younger than 18 years of age, but not for those 18 years of age and older. (*Roper v. Simmons* (2005) 543 U.S. 551, 574 [161 L.Ed.2d 1, 125 S.Ct. 1183] ["The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest."].)

Nor does consideration of "evolving standards of decency" (*Trop v. Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 78 S.Ct. 590] (plur. opn. of Warren, C. J.)) under the Eighth Amendment to the federal Constitution lead us to a different conclusion. When the United States Supreme Court recently considered this issue, it identified an emergent national consensus that execution of individuals for crimes committed when younger than 18 years of age was cruel and unusual. (*Roper v. Simmons*, *supra*, 543 U.S. at pp. 564–567.) It identified no comparable consensus for crimes committed by those age 18 or older. (See *id.* at pp. 579–581 [documenting that no state with a death penalty had a minimum age higher than 18].) Accordingly, we cannot say evolving standards of decency require abolition of the death penalty for crimes committed by 18 year olds.[24]

This is not to say that age is not a relevant factor; under our death penalty scheme, a jury may consider a defendant's age as part of the matrix of factors that may lead it to choose life without the possibility of parole instead of death. (§ 190.3, factor (i).) The jury here was afforded that opportunity, but nevertheless chose death. Neither the federal nor the state Constitution prohibits that verdict.

### I. *Constitutionality of California's Death Penalty*

Finally, Gamache raises a series of challenges to the constitutionality of California's death penalty. We have rejected each challenge before. As

---

[24] Gamache also argues the death penalty is morally wrong and, thus, under evolving standards of decency is unconstitutional as to *all* defendants. However, the United States Supreme Court has established that "capital punishment is constitutional" even under contemporary standards. (*Baze v. Rees* (2008) 553 U.S. 35, 47 [170 L.Ed.2d 420, 128 S.Ct. 1520, 1529] (plur. opn. of Roberts, C. J.); see *id.* at p. 87 [128 S.Ct. at p. 1552] (conc. opn. of Scalia, J.) ["[T]he death penalty is a permissible legislative choice."]; *id.* at p. 95 [128 S.Ct. at p. 1556] (conc. opn. of Thomas, J.) ["[T]he Constitution permits capital punishment in principle . . ."].)

Gamache offers no compelling arguments in favor of reconsidering any of these rulings, we do so again.

"California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty . . . ." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229]; see *People v. Stevens* (2007) 41 Cal.4th 182, 211 [59 Cal.Rptr.3d 196, 158 P.3d 763]; *People v. Chatman* (2006) 38 Cal.4th 344, 410 [42 Cal.Rptr.3d 621, 133 P.3d 534].) Specifically, the felony-murder special circumstance (§ 190.2, subd. (a)(17)) is not overbroad and adequately narrows the pool of those eligible for death. (*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Cruz* (2008) 44 Cal.4th 636, 680 [80 Cal.Rptr.3d 126, 187 P.3d 970]; *People v. Watson* (2008) 43 Cal.4th 652, 703 [76 Cal.Rptr.3d 208, 182 P.3d 543]; *People v. Guerra, supra,* 37 Cal.4th at p. 1165; *People v. Smith* (2005) 35 Cal.4th 334, 373 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

California's grant of discretion to prosecutors to decide in which cases to seek the death penalty is constitutional. (*People v. Rundle* (2008) 43 Cal.4th 76, 199 [74 Cal.Rptr.3d 454, 180 P.3d 224]; *People v. Tafoya, supra,* 42 Cal.4th at p. 198; *People v. Crittenden, supra,* 9 Cal.4th at p. 152.)

The trial court did not err when it gave CALJIC No. 8.85, an instruction we have repeatedly upheld, instead of Gamache's proposed alternative. Contrary to Gamache's argument, the trial court was not constitutionally required to instruct the jury that section 190.3's mitigating factors could be considered only as mitigating factors and that the absence of evidence supporting any one of them should not be viewed as an aggravating factor. (E.g., *People v. Cruz, supra,* 44 Cal.4th at p. 681; *People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Panah, supra,* 35 Cal.4th at pp. 499–500.) Nor did the use of the word "extreme" in section 190.3, factor (d) prevent the jury from considering relevant mitigating evidence. (*Cruz,* at p. 681; *People v. Bonilla, supra,* 41 Cal.4th at p. 360; *People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

Nothing in the state or federal Constitution requires that the penalty jury (1) issue written findings, (2) unanimously agree on any particular aggravating circumstances, or (3) find true any particular aggravating circumstances

beyond a reasonable doubt. (E.g., *People v. Cruz, supra,* 44 Cal.4th at p. 681; *People v. Watson, supra,* 43 Cal.4th at p. 703; *People v. Demetrulias, supra,* 39 Cal.4th at pp. 40, 43.) The trial court is not required to instruct the penalty jury on a " 'presumption of life.' " (*People v. Kipp* (2001) 26 Cal.4th 1100, 1137 [113 Cal.Rptr.2d 27, 33 P.3d 450]; see also *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Nor is the trial court required to instruct the penalty jury on any burden of proof; in California, at the penalty phase, there is no burden of proof, only a normative judgment for the jury. (E.g., *Demetrulias,* at p. 40; *People v. Moon* (2005) 37 Cal.4th 1, 43–44 [32 Cal.Rptr.3d 894, 117 P.3d 591]; *People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182].) Nor was any burden of proof instruction needed to establish a tie-breaking mechanism here; the jury was instructed to return a sentence of death only if it concluded "that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Neither the state nor the federal Constitution requires comparison of Gamache's sentence with the sentences of others. First, intercase proportionality review, also known as comparative proportionality review, is not required to render California's sentencing scheme constitutional. (E.g., *People v. Cruz, supra,* 44 Cal.4th at p. 681; *People v. Watson, supra,* 43 Cal.4th at p. 704; *People v. Demetrulias, supra,* 39 Cal.4th at p. 44.) Second, the equal protection clause does not require California to include in its capital sentencing scheme the same disparate sentence review previously provided noncapital convicts under the Determinate Sentencing Act. (*People v. Bonilla, supra,* 41 Cal.4th at p. 360; *People v. Boyette* (2002) 29 Cal.4th 381, 466, fn. 22 [127 Cal.Rptr.2d 544, 58 P.3d 391].) Third, intracase proportionality review is not constitutionally compelled; the sentence an accomplice receives has little bearing on the individualized consideration of a capital defendant's penalty. (*People v. McDermott* (2002) 28 Cal.4th 946, 1005 [123 Cal.Rptr.2d 654, 51 P.3d 874]; *People v. Bemore* (2000) 22 Cal.4th 809, 857 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

Gamache contends that violations of his state and federal constitutional rights are violations of international law. His premise fails; his sentence was arrived at in compliance with the state and federal Constitutions and relevant statutory requirements, and thus also complies with international law. (*People v. Tafoya, supra,* 42 Cal.4th at p. 199; *People v. Carey* (2007) 41 Cal.4th 109, 135 [59 Cal.Rptr.3d 172, 158 P.3d 743].)

Finally, lengthy confinement under a sentence of death does not constitute cruel and unusual punishment and violates neither the state and federal

Constitutions nor international law. (*People v. Bennett* (2009) 45 Cal.4th 577, 630 [88 Cal.Rptr.3d 131, 199 P.3d 535]; *People v. Dunkle* (2005) 36 Cal.4th 861, 942 [32 Cal.Rptr.3d 23, 116 P.3d 494]; *People v. Panah, supra,* 35 Cal.4th at p. 500; *People v. Jones* (2003) 29 Cal.4th 1229, 1267 [131 Cal.Rptr.2d 468, 64 P.3d 762]; *People v. Anderson* (2001) 25 Cal.4th 543, 606 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29]; *People v. Frye, supra,* 18 Cal.4th at pp. 1030–1031.)

### J. *Cumulative Prejudice from Errors*

Gamache contends that even if we do not conclude any individual error mandates reversal, the cumulative effect of the guilt and penalty phase errors requires reversal of the penalty verdict. We disagree. We have identified only one error during the guilt phase, the erroneous phrasing of CALJIC No. 2.15, and one error during the penalty phase, the inadvertent introduction of the December 4 videotape into the jury room. Each error was harmless. Considered together, their cumulative effect was likewise harmless, and Gamache was not denied a fair penalty phase trial.

### K. *Non-death-penalty Sentencing Errors*

#### 1. *Calculation of determinate sentence*

In addition to the death sentence and three life sentences for murder, attempted murder, and kidnapping for purposes of robbery, Gamache received consecutive determinate sentences for two counts of robbery, one count of burglary, and gun use enhancements on each count. Both sides agree the trial court erred in calculating the determinate portion of Gamache's sentence.

First, the trial court sentenced Gamache to the upper term of six years, with an additional five-year gun use enhancement, on both count three (§§ 211 [first degree residential robbery], 12022.5, subd. (a) [gun use]) and count five (§§ 459 [first degree residential burglary], 12022.5, subd. (a) [gun use]). Under the Determinate Sentencing Act, however, the trial court should have imposed the full term for only one of these violent felonies, and instead imposed one-third the middle term (one year four months) and one-third the enhancement (one year eight months) on the second felony. (See § 1170.1.) Thus, both sides agree, the trial court should have sentenced Gamache to a total of three years, not 11 years, on the subordinate of these two felonies.

Second, when sentencing Gamache for gun use enhancements in connection with the three life sentence counts (counts two, six, and seven),

the trial court imposed only one-third the middle term, or one year four months. But as the People point out, and Gamache concedes, the statutory limits that require additional enhancements to be limited to one-third the designated term apply only to crimes for which a determinate sentence is imposed; they do not apply to enhancements attached to indeterminate terms. (*People v. Felix* (2000) 22 Cal.4th 651, 656 [94 Cal.Rptr.2d 54, 995 P.2d 186].) Thus, on counts two, six, and seven, the trial court should have selected from the full lower, middle, or upper term, rather than one-third the middle term. As we cannot determine how the trial court would have exercised its sentencing discretion on these enhancements had it properly understood that it had discretion, we will remand to allow the trial court to exercise its discretion in the first instance. (See, e.g., *People v. Oates* (2004) 32 Cal.4th 1048, 1068–1069 [12 Cal.Rptr.3d 325, 88 P.3d 56].)

## 2. *Restitution*

Gamache contends the trial court erred by imposing a $10,000 victim restitution fine without taking adequate consideration of his ability to pay. (See § 1202.4.) We find no error.

First, Gamache forfeited this claim by failing to object at his sentencing hearing. We reject Gamache's contention that any forfeiture should be excused so that he may benefit from the ameliorative statutory amendments that occurred while his case was on appeal. (See *People v. Vieira, supra,* 35 Cal.4th at pp. 305–306.) Unlike in *Vieira,* Gamache's claim does not depend on any subsequent amendments; the law at the time of both his 1992 crime and 1996 sentencing called for the trial court to consider his ability to pay in setting a restitution fine, and Gamache could have objected at the time if he believed inadequate consideration was being given to this factor. (See Gov. Code, former § 13967, subd. (a), as amended by Stats. 1992, ch. 682, § 4, p. 2922 [restitution fine "subject to the defendant's ability to pay"]; Pen. Code, § 1202.4, subd. (d) [trial court shall consider "defendant's inability to pay"].)

Second, Gamache's claim fails on the merits. He points to no evidence in the record supporting his inability to pay, beyond the bare fact of his impending incarceration. Nor does he identify anything in the record indicating the trial court breached its duty to consider his ability to pay; as the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor. Thus, we cannot say on this record that the trial court abused its discretion.

## DISPOSITION

We conclude the trial court's judgment should be affirmed as to Richard Gamache's conviction for special circumstance murder (count one) and corresponding sentence of death, as well as his convictions for attempted murder (count two), robbery (counts three and four), burglary (count five), and kidnapping for robbery (counts six and seven). It should be reversed as to the determinate portions of Gamache's sentence on counts two, three, five, six, and seven and this case remanded to permit the trial court to exercise its discretion and correct the judgment in accordance with the views expressed in this opinion.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied April 22, 2010.